4. Sᴀᴍᴇ: contributory negligence.

---

Cʜᴀʀʟᴇs L. MᶜGᴜɪʀᴇ, Appellant, v. Tʜᴇ Cʜɪᴄᴀɢᴏ, Bᴜʀʟ-ɪɴɢᴛᴏɴ & Qᴜɪɴᴄʏ Rᴀɪʟʀᴏᴀᴅ Cᴏᴍᴘᴀɴʏ, Appellee.

**Statutes:** ᴀᴍᴇɴᴅᴍᴇɴᴛ: ᴄᴏɴsᴛʀᴜᴄᴛɪᴏɴ. An amended statute will
1  be construed as if the original statute had been repealed and a new and independent act, in the amended form adopted, unless a contrary intent is clearly indicated.

**Same:** ɢᴇʀᴍᴀɴᴇ ᴘʀᴏᴠɪsɪᴏɴs: ɴᴇɢʟɪɢᴇɴᴄᴇ ᴏғ ғᴇʟʟᴏᴡ sᴇʀᴠᴀɴᴛ: ʟɪᴀ-
2  ʙɪʟɪᴛʏ. Code, section 2071, as originally enacted, provided in general terms that any contract with a railway company which limited its liability for the negligence of a fellow-servant should be void. The amendment of the Twenty-seventh General Assembly provides, among others, that no contract for insurance or relief, in case of accident, made prior to the injury shall constitute a defense to an action therefor. Held that the amendment is germane to the original act and should be construed in connection therewith.

**Statutes:** ᴀᴍᴇɴᴅᴍᴇɴᴛ: ᴛɪᴛʟᴇ. The title of an amendatory act,
3  which contains provisions germane to the original statute, is sufficient if it designates itself as an amending act and refers to the section of the Code to be amended, without stating the substance of the proposed amendment.

**Constitutional law:** ᴠᴀʟɪᴅɪᴛʏ ᴏғ sᴛᴀᴛᴜᴛᴇs. The courts will not de-
4  clare a legislative act unconstitutional until it is clearly shown that under no state of facts can it be upheld.

**Legislative power.** Subject to the power expressly or by necessary implication delegated to the Federal Government, the state has sovereign legislative power over all subjects, except such as are reserved by the state constitution.

**Fourteenth amendment:** CORPORATIONS. A corporation is a "person" within the meaning of the fourteenth amendment to the Federal Constitution and is not to be denied any of the rights therein guaranteed.

**Same:** CLASSIFICATION. A reasonable classification of persons according to occupation, business or other circumstances, for legislative purposes, by which all persons of that class are affected alike, is not a violation of the fourteenth amendment to the Federal Constitution, or of the State Constitution.

**Constitutional law:** EQUAL PROTECTION. Code, section 2071, as amended by the 27th General Assembly, imposing upon railway companies liability for the negligence of fellow servants regardless of any contract of insurance or relief entered into between the person injured and the corporation, prior to the injury, by which such liability was limited, is not repugnant to the Constitution as denying to all persons equal protection of the law.

**Right of private contract.** Code, section 2071, as amended, declaring invalid any contract limiting the liability of a railway company for negligence of a fellow servant is not an unwarranted interference with the right of private contracts.

**Police power.** The statute declaring invalid any private contract limiting the liability of a railway company for the negligence of a fellow servant is not an arbitrary and unreasonable exercise of the police power of the state.

**Regulation of corporations.** Legislative power to create corporations implies power to thereafter prescribe reasonable regulation even though the right to repeal or amend the charter is not reserved by the state.

**Regulation of foreign corporations.** The fact that a corporation is engaged in interstate commerce does not deprive the State of power to exercise reasonable control over its business done wholly within the state.

LADD and BISHOP, J. J., dissenting.

*Appeal from Appanoose District Court.—* HON. M. A. ROBERTS, Judge.

SATURDAY, JULY 14, 1906.

The opinion states the case.— *Reversed.*

*C. F. Howell* and *C. H. Elgin,* for appellant.

*H. H. Trimble, Palmer Trimble, F. S. Payne,* and *J. W. Blythe,* for appellee.

Weaver, J.— The plaintiff's petition at law alleges that, while in the service of the defendant railway company as brakeman and while in the exercise of reasonable care for his own safety, he was seriously and permanently injured by reason of the negligence of a co-employé in the management of the train on which he was employed, and he asks to recover damages in the sum of $2,000. As a bar to the plaintiff's right of recovery the defendant alleges that at the time of the accident in which plaintiff was injured he was a member of the Burlington Relief Department, an association organized by the defendant and its employés (the rules and regulations of which are made a part of the answer), and that by reason of such membership the plaintiff became entitled to recover certain benefits, while disabled by physical injury and that he did in fact receive from the association on that account the aggregate sum of $822. It is further alleged that by the terms of the contract embodied in the Relief Department regulations plaintiff had an election to accept said benefits, or to waive them and insist upon his claim against the defendant for damages, but he was not entitled to both, and that by reason of his acceptance of such benefits he is now estopped to recover anything in this action. The answer further asserts that the provisions of Code, section 2071, as amended by the Twenty-Seventh General Assembly have no effect to bar or estop the defendant from relying upon the defence above stated, because said amendment is in contravention of the Constitution of the United States and the Constitution of the State of Iowa. A demurrer to the answer having been overruled, the plaintiff appeals.

The questions suggested by the record and argued by counsel may be condensed as follows: (1) Assuming the truth of the matters pleaded in the petition and answer, is the case one calling for the application of the statutory provision upon which plaintiff relies? (2) If the foregoing question be answered in the affirmative, is Code, section 2071, as it now stands, a valid exercise of legislative power, or is it void as being in contravention of the Constitution, national or state?

I. As originally enacted Code, section 2071, was in words as follows: " Every corporation operating a railway shall be liable for all damages sustained by any person, including the employés of such corporation, in consequence of the neglect of the agents, or by any mismanagement of the engineers or other employés thereof, and in consequence of the willful wrongs whether of commission or omission of such agents, engineers or other employés when such wrongs are in any manner connected with the use and operation of any railway on or about which they shall be employed, and no contract which restricts such liability shall be legal or binding." The amendment to which reference has been made adds to said section the following: " Nor shall any contract of insurance relief, benefit or indemnity in case of injury or death, entered into prior to the injury, between the person so injured and such corporation or any other person or association acting for such corporation, nor shall the acceptance of any such relief, insurance, benefit or indemnity by the person injured, his widow, heirs or legal representatives after the injury, from such corporation, person or association, constitute any bar or defense to any cause of action brought under the provisions of this section; but nothing contained herein shall be construed to prevent or invalidate any settlement for damages between the parties subsequent to the injuries received." The events leading up to the adoption of this amendment are matters of common knowledge. Subsequent to the enactment of Code, section

2071, in its original form, a relief department scheme for the payment of benefits to the injured employés was organized by the appellee herein; one of the provisions or regulations of the department being that the bringing of suit by a member for damages should suspend his right to receive further benefits until the suit was discontinued, and the acceptance of the benefits should operate as a release and satisfaction of all claims for damages. Prior to the adoption of the amendment it was held by this court that the relief contract was not void as being against public policy, and employés of the railway who accepted benefits from the association on account of injuries received in the company's service were held to be barred from the recovery of damages. *Donald v. Railroad Co.,* 93 Iowa, 284; *Maine v. Railroad Co.,* 109 Iowa, 260. Upon the announcement of the first of the cited decisions the matter of further legislation to restrict or prohibit contracts of this nature became a topic of very general discussion throughout the state, and in apparent response to the public sentiment manifested, the Twenty-Eighth General Assembly enacted the amendment quoted above. That it was intended to invalidate defenses like that which is here pleaded, and to permit an employé injured by the neglect of the corporation or its servants to recover his damages, notwithstanding the terms of his membership in the Relief Department or the receipt of benefits thereunder, seems to be very clear from the language employed. To the extent that the legislative will is here expressed, the question of public policy which has been argued by counsel, is eliminated; for the statute, if constitutional, must stand as the authoritative expression of the public policy of the state, which the courts are bound to observe and enforce.

But it is said in behalf of appellee that the amendment, even if valid, has reference to such relief contracts only as operate to " restrict the liability " of the company, and that this court, by its decisions under the statute as it

stood before the amendment, has already held contracts sim-
ilar to the one now before us not to be of that
character.  This argument is reinforced by
the further proposition that, if the amend-
ment is to be construed as enlarging the scope of the section
and applied to cases not before within its prohibition, it must
be held unconstitutional, because the title, " An act to amend
Code, section 2071," does not sufficiently set forth the sub-
ject of the legislation.  It will be conceded that, to be of
any effect, an amendment to a statute must have some rele-
vancy to the original act, and the two are to be read together
in seeking to discover the legislative will and purpose.  But
there is no rule of interpretation requiring us to give the
amended statute a meaning which differs in any degree from
that which would have been given it, had the matter of
amendment been made a part of the original act.  In other
words, unless the contrary intent is clearly indicated, the
amended statute is to be construed as if the original statute
had been repealed and a new and independent act in the
amended form had been adopted.  *Holbrook v. Nichols,* 36
Ill. 161; *McKibben v. Lester,* 9 Ohio St. 627; *Farrell v.
State,* 54 N. J. Law, 421, (24 Atl. 725); *Kamerick v. Cas-
tleman,* 21 Mo. App. 587; *Humphrey v. Parsons,* 15 N. Y.
595; *Conrad v. Nall,* 24 Mich. 277.

Now, Code, section 2071, as first enacted, making rail-
way companies liable for injuries occasioned to a servant
by the negligence of a fellow servant, gave to employés
in that service an important right or measure
of protection which did not before exist, and
undertook to guard the same by a provision
rendering void any agreement or stipulation in the contract
of employment waiving or restricting the benefit of such
statutes.  This provision was stated in general terms only,
and, when it was invoked to avoid the effect of appellee's relief
department contract, this court decided, as we have already
seen, that such contract did not restrict the statutory liability

1. STATUTES:
amendment:
construction.

2. SAME: germane
provisions:
negligence of
fellow servant:
liability.

of the corporation and was therefore not affected by the prohibition. Thereafter, and by the amendment referred to, the Legislature added a clause enumerating certain specific acts, agreements, contracts, and stipulations which shall constitute no defense to an action brought for the enforcement of the statutory liability. That enumeration so accurately describes the contract upon which the appellee here relies that it would be a mere affectation to profess to misunderstand it. To place upon it the construction asked for by the appellee is to deprive the amendment of all force and effect. The section in its original form invalidated in general terms all contracts restricting the liability of the corporation; and if, as contended, the amendment must be construed as applying only to such agreements for insurance, indemnity, or benefits as tend to " restrict " that liability within the meaning of the court's opinion in the Donald case, then it neither increases nor diminishes the scope of the original provision, and the passage of the amending act was an idle and useless ceremony. Its words are not in the least obscure, its purpose is obvious, and unless we arbitrarily disregard the plain terms of the statute it must be construed in substantial accord with the appellant's contention. This being determined, we have next to inquire concerning its validity.

II.  There is, in our judgment, no fatal defect in the title of the amending act. That act has but one purpose — the amendment of Code, section 2071, and that purpose is succinctly stated. It is a general rule that a 3. STATUTES: amendment: title. title which simply names or describes an amending act as such, without stating the specific character or substance of the amendment, is sufficient. *Morford v. Unger,* 8 Iowa, 82; *Iowa S. & L. v. Selby,* 111 Iowa, 402; *Timm v. Harrison,* 109 Ill. 593; *People v. Whitlock,* 92 N. Y. 191; *Robinson v. Lane,* 19 Ga. 337. The act as amended relates to but one subject. The object sought to be obtained by the original statute was the

imposing of a liability upon railway corporations in favor of their employés and the protection of the latter in the right thus created.   If, in view of the practical operation of the statute, the Legislature wisely or unwisely concluded that the protection thus provided was not sufficient for the intended purpose, and desired to specifically provide that the right given to the employés should not be waived or lost by reason of his membership in a railway Relief Department or by participation in its benefits, it seems plain that (assuming the validity of such legislation in any form) it was entirely competent to so enact by way of amendment to the original statute, and that such amendment does not introduce a new subject of legislation.   Generally speaking, the purpose of every amendment is to enlarge or restrict the application or effect of the statute so sought to be amended, and the fact that in the case at bar the amended statute is made to include within its prohibition a class of contracts which escaped the ban of the original act does not introduce a new or independent subject of legislation.   It is only the general purpose which is to be expressed in the title, and not the methods or provisions by which that purpose is to be accomplished.   *People v. Hurlburt,* 24 Mich. 44 (9 Am. Rep. 103); *People v. Briggs,* 50 N. Y. 533; *Murdock v. Woodson,* 2 Dill. 188, Fed. Cas. No. 9,942.   It is sufficient if the provisions of the statute expressed have congruity and proper connection.   *De Witt v. San Francisco,* 2 Cal. 289; *Commonwealth v. Green,* 58 Pa. 226; *State v. Mines,* 38 W. Va. 125 (18 S. E. 470); *Robinson v. State,* 15 Tex. 311; *Reed v. State,* 12 Ind. 641.   The title to an act " need not go into details.   It is sufficient if it indicates with reasonable precision and clearness the subject which it embraces.   Nor is the act invalid because it includes details not mentioned in the title, provided the details are germane to the general subject designated in the title."   *Pittsburg Ry. Co. v. Montgomery,* 152 Ind. 1 (49 N. E. 582, 69 L. R. A. 875, 71 Am. St. Rep. 301.)   The title to the original act and of

the amendment comes fairly within the rule of these authorities, and the objection thereto is not well taken.

III. Summing up their argument against the validity of the statute, counsel narrow the question to the proposition that it violates the fourteenth amendment to the Constitution of the United States, as well as the somewhat similar provisions found in our state Constitution. They say: "There are but two provisions of the Constitution of the United States relied upon by appellee in this case. These are found in the fourteenth amendment. The substance of these provisions is that no State shall pass any law that will deprive any person of the right of life, liberty, and property, or deprive any person of the equal protection of the law. There are two provisions in our State Constitution, substantially similar: Section 1, article 1, and section 6, article 1. We assume that the court will regard itself bound to determine whether the Temple amendment is repugnant to these two provisions of the State Constitution." The questions thus raised are of great importance and have been thoroughly and exhaustively presented in the briefs of counsel. It is well, at the threshold of the discussion, to recall the familiar rule by which we are bound in passing upon any proposition affecting the constitutionality of a legislative enactment. While it is an imperative duty, from which no court will shrink, to declare void any statute the unconstitutionality of which is made apparent, due regard to the boundary between the legislative and judicial departments of our government requires that this prerogative be exercised with the greatest caution, and only after every reasonable presumption has been indulged in favor of the validity of the act. *Merchants' Union v. Brown,* 64 Iowa, 275; *Stewart v. Supervisors,* 30 Iowa, 9; *Duncombe v. Prindle,* 12 Iowa, 1; *Reed v. Wright,* 2 G. Greene, 15; *State v. Judge,* 2 Iowa, 280; *Whiting v. Mt. Pleasant,* 11 Iowa, 482; *Flint & F. Plank Road Co. v. Woodhull,* 25 Mich. 99 (12 Am. Rep. 233);

4. CONSTITU-
TIONAL LAW:
validity of
statutes.

*Evans v. Job,* 8 Nev. 322.   It is not the province of the court to pass upon the policy, wisdom, or justice of the statute, or upon the expediency of its enactment.   *Railroad Co. v. Supervisors,* 67 Iowa, 199; Merchants' Union v. Brown, *supra.*

So thoroughly are the courts committed to this theory of the law that in Stewart v. Supervisors, *supra,* it is said that " a legislative act may be declared unconstitutional only when it violates that instrument clearly, palpably, plainly, and in such manner as to leave no reasonable doubt."   In this same case we approvingly quoted the language of Mr. Justice Baldwin of the federal court as follows:   " We cannot declare a legislative act void because it conflicts with our opinions of policy, expediency, or justice.   We are not the guardians of the rights of the people of the State, unless they are secured by some constitutional provision which comes within our judicial cognizance.   The remedy for unwise or oppressive legislation within constitutional bounds is by appeal to the justice and patriotism of the representatives of the people.   If this fail, the people in their sovereign capacity can correct the evil; but the courts cannot assume their rights."

The inquiry to which we are confined is one of legislative power alone.   It is fundamental in our system of government that all powers not delegated to the United States by

5. **Legislative power.** the terms of the federal Constitution and its amendments, nor prohibited by it to the States, are reserved to the States or to the people.   Constitution United States' Amendment 10.   Subject to the authority thus expressly or by necessary inference delegated to the federal government, the State has sovereign legislative power over all subjects, except such as are withheld from it by the Constitution of the State itself.   *Boyd v. Ellis,* 11 Iowa, 97; *Stewart v. Supervisors,* 30 Iowa, 9; *Purzell v. Smidt,* 21 Iowa, 540; *Morrison v. Springer,* 15 Iowa, 324; *Boyer v. Kinnick,* 90 Iowa, 74; *Hawkeye v. French,* 109 Iowa, 588;

*New York v. Miln,* 36 U. S. 102 (9 L. Ed. 648); *R. R. Co. v. Dey,* 82 Iowa, 312; *In re Meador,* Fed. Cas. No. 9,375; *Wadleigh v. Develling,* 1 Ill. App. 596; *Moor v. Veazie,* 32 Me. 343 (52 Am. Dec. 655); *Beyman v. Black,* 47 Tex. 558. It is not for the court to inquire or determine whether a state of facts existed calling for the enactment of the legislation in question. That is for the exclusive consideration of the Legislature. If under any possible state of facts the act would be constitutional and valid, the court is bound to presume that such condition existed. *Munn v. Illinois,* 94 U. S. 113 (24 L. Ed. 77); *State v. Peckham,* 3 R. I. 289; *In re Ten Hour Law,* 24 R. I. 603 (54 Atl. 602).

IV. Is the statute objectionable as class legislation, or as denying to the corporation the equal protection of the laws? The fourteenth amendment to the Constitution of the United States provides, among other things, that no State shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. While a corporation is not a citizen within the meaning of this amendment, it is a " person," and as such may not rightfully be denied the protection of the laws of the State upon equal terms with all other persons under like circumstances and conditions. *Smyth v. Ames,* 169 U. S. 466 (18 Sup. Ct. 418, 42 L. Ed. 819); *Blake v. McClung,* 172 U. S. 239 (19 Sup. Ct. 165, 43 L. Ed. 432); *Pembina v. Pennsylvania,* 125 U. S. 188 (8 Sup. Ct. 737, 31 L. Ed. 650); *N. Y. & N. E. R. R. Co. v. Bristol,* 151 U. S. 556 (14 Sup. Ct. 437, 38 L. Ed. 269.)

6. Fourteenth amendment: corporations.

But the reasonable classification of persons for the purposes of legislation according to occupation, business, or other circumstances, by which one class or portion of the people is differentiated from other portions or classes, has often been held not to be a violation of this constitutional guaranty. The mere fact that legislation is special, and made to apply to certain persons

7. Same: classification.

and not to others, does not affect its validity, if it be so made that all persons subject to its terms are treated alike under like circumstances and conditions. *Hayes v. Missouri,* 120 U. S. 68 (7 Sup. Ct. 350, 30 L. Ed. 578); *Commonwealth v. Railroad Co.,* 187 Mass. 436 (73 N. E. 530; *State v. Nelson,* 52 Ohio St. 88 (39 N. E. 22, 26 L. R. A. 317); *People v. Smith,* 108 Mich. 527 (66 N. W. 382, 32 L. R. A. 853, 62 Am. St. Rep. 715); *People v. Walbridge,* 6 Cow. (N. Y.) 512; *Dugger v. Insurance Co.,* 95 Tenn. 245 (32 S. W. 5, 28 L. R. A. 796); *Walston v. Nevin,* 128 U. S. 578 (9 Sup. Ct. 192, 32 L. Ed. 544); *Duncan v. Missouri,* 152 U. S. 377 (14 Sup. Ct. 570, 38 L. Ed. 485); *Broadfoot v. Fayetteville,* 121 N. C. 422 (28 S. E. 515, 39 L. R. A. 245, 61 Am. St. Rep. 668); *State v. Tower,* 185 Mo. Sup., 79 (84 S. W. 10, 68 L. R. A. 402); *People v. Bellett,* 99 Mich. 151 (57 N. W. 1094, 22 L. R. A. 696, 41 Am. St. Rep. 589.)

Such, also, has been the uniform holding of this court with reference to the corresponding provision in our state Constitution. A leading case to this effect is *McAunich v. Railroad,* 20 Iowa, 338. As we there said: " Such laws are general and uniform, not because they operate upon every person in the State, but because every person who is brought within the relations and circumstances provided for is affected by the law. They are general and uniform in their operation upon all persons in the like situation and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation." Treating the same question, the Supreme Court of the United States by Field, J., in *Railroad v. Mackey,* 127 U. S. 205 (8 Sup. Ct. 1161, 32 L. Ed. 107), says: " The greater part of all legislation is special, either in the objects sought to be attained by it or in the extent of its application. . . . Such legislation does not infringe upon the clause of the fourteenth amendment requiring equal protection of the laws because it is special in character. And when legisla-

tion applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies to them the equal protection of the laws if all persons brought under its influence are treated alike under the same condition." See, also, *People v. Havnor,* 149 N. Y. 205 (43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707); *Missouri v. Lewis,* 101 U. S. 22 (25 L. Ed. 989); *Duncan v. Missouri,* 152 U. S. 377 (14 Sup. Ct. 570, 38 L. Ed. 485); *Watson v. Nevin,* 128 U. S. 578 (9 Sup. Ct. 192, 32 L. Ed. 544); *Giozza v. Tiernan,* 148 U. S. 657 (13 Sup. Ct. 721, 37 L. Ed. 599); *Railroad Co. v. Backus,* 154 U. S. 421 (14 Sup. Ct. 1114, 38 L. Ed. 1031); *Railroad Co. v. Crider,* 91 Tenn. 501 (19 S. W. 618); *Butte v. Paltrovich,* 30 Mont. 18 (75 Pac. 521, 104 Am. St. Rep. 698.)

That legislation imposing upon railway companies special restrictions, obligations, and liabilites not generally applicable to other persons or corporations is not a denial of

8. Constitu-
tional law:
equal protec-
tion.

the equal protection of the laws has been so often decided as to be no longer a debatable question. Thus the courts have upheld statutes depriving railway companies of the benefit of the fellow servant doctrine, *Herrick v. Railroad,* 31 Minn. 11 (16 N. W. 413, 47 Am. Rep. 771); *Railroad v. Mackey,* 127 U. S. 205 (8 Sup. Ct. 1161, 32 L. Ed. 107); *Railroad v. Herrick,* 127 U. S. 210 (8 Sup. Ct. 1176, 32 L. Ed. 109); requiring a railway company to pay attorney's fees to the landowner in condemnation proceedings, *Gano v. Railroad,* 114 Iowa, 719, subjecting railway corporatins to double damages under certain circumstances, *Railroad Co. v. Humes,* 115 U. S. 512 (6 Sup. Ct. 110, 29 L. Ed. 463); *Railroad v. Beckwith,* 129 U. S. 26 (9 Sup. Ct. 207, 32 L. Ed. 585); denying railway corporations the right of appeal from assessment for taxation, although such right is given to owners of other taxable property, *Railroad v. Backus,* 154 U. S. 421 (14 Sup. Ct. 1114, 38 L. Ed.

1031); making such corporations liable without regard to negligence for fires set by their engines, *Railroad v. Matthews,* 174 U. S 96 (19 Sup. Ct. 609, 43 L. Ed. 909); and requiring them to pay without discount to a discharged employé wages earned at the time of discharge, *Railroad v. Paul,* 173 U. S. 404 (19 Sup. Ct. 419, 43 L. Ed. 746.) In each of these cases, and in many others which might be cited, the statute under consideration was made applicable to railway companies only, and in each case it was vigorously assailed as a denial of the equal protection of the laws; but in each instance, after thorough argument proceeding along the lines followed by counsel for the appellee herein. the court of last resort has uniformly held the legislation to be a valid exercise of the police power of the states. In view of these decisions we think it beyond question that the statute here under consideration cannot be said to be void as a denial of the equal protection guarantied by the fourteenth amendment. As to the general nature of this amendment and the limits of its application, see *Davidson v. New Orleans,* 96 U. S. 97 (24 L. Ed. 616); *Railroad Co. v. Humes,* 115 U. S. 512 (6 Sup. Ct. 110, 29 L. Ed. 463); *Barber v. Connolly,* 113 U. S. 27 (5 Sup. Ct. 357, 28 L. Ed. 923); *Railroad Co. v. May,* 194 U. S. 267 (24 Sup. Ct. 638, 48 L. Ed. 971); *Insurance Co. v. Dobney,* 189 U. S. 301 (23 Sup. Ct. 565, 47 L. Ed. 821); *Froelich v. Railroad Co.,* 24 Ohio Cir. Ct. R. 359; *Railroad Co. v. Mahaffey* (Tex. Civ. App.), 81 S. W. 1047.

V. Is the statute an unwarranted interference with liberty of contract? The right of contract is not one of the rights which are guaranteed in express words by the Constitution, but such protection exists as a necessary

9. Right of pri- inference from the express guaranty of prop-
vate contract. erty rights. This right, like all others possessed by the individual member of society, is held subject to such reasonable restrictions and regulations as may be imposed for the general good. The power by which these

limitations are imposed upon the liberty of the individual is commonly called the " police power," which is but another name for that portion of the sovereignty of the state not surrendered by the terms of the national compact. The police power, as that term is commonly employed, may be paraphrased as society's natural right of self-defense, and its definition and limitation vary with the circumstance calling for its exercise. To embalm it in any fixed or rigid formula would be to destroy its value, for it would then be deprived of its indispensable quality of adaptation to changing conditions, and thus defeat the ends it was intended to promote. Words & Phrases, vol. 6, page 5, 424, and cases there cited. While protection of public health and public morals and the promotion of social order are peculiarly within its province, these are but instances of its application, and do not limit its sphere of action. *People v. Budd,* 117 N. Y. 1 (22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460); *Barber v. Connolly,* 113 U. S. 27 (5 Sup. Ct. 357, 28 L. Ed. 923.)

The police power of the state is the power to govern men and things within the limit of its dominions. · It comprehends all those general laws of internal regulations necessary to secure peace, good order, health, and prosperity of the people, and the regulations and protection of property and property rights. *State v. Harrington,* 68 Vt. 622 (35 Atl. 515, 34 L. R. A. 100); *State v. Reynolds* (Conn.), 58 Atl. 755. It adapts itself to the changing conditions of society, and makes it competent for the state to devise, adopt, and enforce any new regulation or restriction, not clearly forbidden by the Constitution, which it believes to be expedient under the peculiar circumstances with which it is sought to deal. The spirit which pervades the police power is closely related to that which is embodied in the common-law maxim, " Sic utere tuo alienum non lædas." The liberty of the individual may always be restrained where its unregulated exercise becomes a source of danger or injury to the society of which

that individual is a member.    "As soon as any part of a
person's conduct affects prejudicially the interests of others,
society has jurisdiction over it."    Mill on Liberty, chapter
4.    See, also, *Powell v. Commonwealth,* 114 Pa. 265 (7
Atl. 913, 60 Am. Rep. 350); *Oil City v. Trust Co.* 151 Pa.
454 (25 Atl. 124, 13 Am. St. Rep. 770); *Crowley v.
Christensen,* 137 U. S. 89 (11 Sup. Ct. 13, 34 L. Ed. 620);
*Jamieson v. Oil Co.,* 128 Ind. 566 (28 N. E. 76, 12 L. R.
A. 652); *Garrett v. Mayor,* 47 La. Ann. 630 (17 South,
238); *Stone v. Mississippi,* 101 U. S. 814 (25 L. Ed.
1079); *State v. Tower,* 185 Mo. Sup. 79, (84 S. W. 10,
68 L. R. A. 402.)

Of course, it must be kept in mind that the police power,
like all other powers of the state, is subordinate to the Consti-
tution, and if the Legislature, under the guise of police
regulation, transgress the express or clearly implied limits
drawn by the Constitution the courts will hold the act void
and of no effect.    But this authority of the court involves
a duty of the most delicate and responsible character, and,
as we have already said, is to be exercised in no doubtful
case.    The court is not to substitute its own ideas for those
of the Legislature as to the propriety, wisdom, or justice of
the statute.    It must not arrogate to itself superior knowl-
edge of the public needs, nor assume to prescribe remedies
for public ills.    Cases may perhaps be found where this
fundamental distinction has apparently been overlooked, thus
affording some measure of support for the proposition ad-
vanced by counsel that "the validity of the statute depends
upon the question whether it is a measure for the public
good."    The adoption of such a rule would be to transfer the
lawmaking power to the judiciary and work the utter elimina-
tion of the legislative department as a co-ordinate branch of
the government.    The courts do not sit to revise or review
legislative action, and if they hold an act invalid it is be-
cause the Legislature has failed to keep within the express
or clearly implied limitations of the Constitution.    A court

has no right to declare an act invalid solely because of unjust and oppressive provisions, or because it is supposed to violate the natural, social, or political rights of the citizen, unless it can be shown that such injustice is prohibited or such rights guaranteed, by the Constitution. Except when the Constitution has imposed limits upon the legislative power, it must be considered practically absolute. Neither are the courts at liberty to declare an act void merely because in their judgment it is opposed to the spirit of the Constitution. They must be able to point out the specific provision, expressed or clearly implied from what is expressed, which the act violates. Cooley's Constitutional Limitations, chapter 7, *Winter v. Jones,* 10 Ga. 190 (54 Am. Dec. 379.)

The duty to keep within the constitutional limits of its jurisdiction is no less binding upon the court than upon the Legislature. It is a settled proposition that the fourteenth amendment to the federal Constitution was not intended to limit or hamper the states in the exercise of their police powers. *Mugler v. Kansas,* 123 U. S. 623 (8 Sup. Ct. 273, 31 L. Ed. 205) ; *In Re Kennler,* 136 U. S. 436 (10 Sup. Ct. 930, 34 L. Ed. 519) ; *Ex parte Converse,* 137 U. S. 624 (11 Sup. Ct. 191, 34 L. Ed. 796) ; *Powell v. Pennsylvania,* 127 U. S. 678 (8 Sup. Ct, 992, 1257, 32 L. Ed. 253). Considering a statute like our Code, section 2071, the Minnesota court declares it to be " a police regulation intended to protect life, person, and property by securing a more careful selection of servants and a more rigid enforcement of their duties by railroad companies." *Mikkelson v. Truesdale,* 63 Minn. 137 (65 N. W. 260). Nor is this protection confined to the employés alone. It tends as well to increase the safety of the millions of people and the vast aggregate of property daily transported by these companies, and the public interest is directly subserved and promoted by every reasonable rule or device by which negligence in such business is lessened or prevented. The Ohio court, discussing a similar statute of that state, has said that the liability is not created for the

benefit of the employés alone, but has its reason and foundation in public necessity and policy.    *Railroad Co. v Spangler*, 44 Ohio St. 471 (8 N. E. 467, 58 Am. Rep. 833).    See also, *Kane v. Railroad Co.*, 133 Fed. 681 (67 C. C. A. 653, 68 L. R. A. 788.)

VI.    Assuming, then, that the statute is not to be avoided as class legislation, or as depriving railway corporations of the equal protection of the laws, let us inquire whether it is of such manifestly arbitrary and unreasonable character that it cannot be justified by reference to the police power?    For several reasons we are constrained to answer this inquiry in the negative:

10. Police power.

(1)    It should be kept in view at all stages of this discussion that the enactment, the validity of which is denied by the appellee, is an attempt by the Legislature to protect a right which Code, section 2071, in its original form, conferred upon railway employés; and we think it a rule, the soundness of which cannot be successfully denied, that where the Legislature, acting within its constitutional power, provides a right or confers a benefit which did not before exist, it may, in its discretion, also provide that no contract by which that right or benefit may be waived, lost, or impaired shall be of any validity whatever.    For instance, having given homestead rights to heads of families and exemptions to debtors in execution, no one at this day will question the power of the Legislature to provide that any contract which in its judgment may serve to defeat or lessen the value of the right so created shall be void.    The authorities upon this and kindred propositions are too numerous and familiar to require citation.    Congress, having provided pensions and bounties for the benefit of persons performing military service, may make invalid any contract by which the soldier agrees to pay more than a certain fixed sum to his attorney for assistance rendered in establishing his right to the benefit thus created, and may even make it a crime for the attorney to demand or receive more than the statutory fee, even though

he demands or receives no more than he has reasonably earned. *Frisbie v. United States,* 157 U. S. 160 (15 Sup. Ct. 586, 39 L. Ed. 657.) As we have already noted, the validity of the statute abolishing the fellow servant rule in the interest of railway employés has been fully established in both state and federal courts, and in our judgment the amendment of 1898 was a legitimate exercise of the inherent power of the Legislature to protect the right which it had created. That the act is reasonably adapted to affect its ostensible purpose to prevent an improvident waiver or surrender by the employé of the right conferred upon him by the law can hardly be questioned. Without some limitation upon the right of contract a law imposing liability upon the employer in favor of the employé would be of no practical benefit to the latter; for, in the absence of any restriction, the natural and certain recourse of the employer would be to make the waiver of such benefit a condition of every contract of employment. Possibly, even without a statute, such waiver would be held void on grounds of public policy, but that fact does not negative the propriety or validity of protective legislation.

It was in view of this situation that our lawmakers sought, both in the original act and in the amendment, to fence against the frustration of its purpose to confer a substantial benefit upon a large class of citizens engaged in a hazardous quasi public employment. That the appellee's Relief Department was devised to require or induce its employés to pool their contributions, and through the medium of an insurance or benefit fund, made up chiefly by deductions from their wages, pay their own losses, and thus in some degree relieve the corporation from the liability imposed by the statute, is not seriously disputed. Under the original statute this contract did not constitute a restriction upon the liability of the corporation because, as held by us in the cases of Donald and Maine, the employé who became a member of the Relief Department retained the option to pursue his action for damages or accept the alternative relief afforded by the

department.   But the Legislature might not unreasonably believe and evidently did believe that such contract, even if as a technical legal proposition it did not restrict the corporate liability, operated to lessen the value of the benefit conferred by the statute.   Entertaining such view, the enactment of the amendment of 1898 was a natural and appropriate measure to prevent the indirect defeat of the benevolent purpose of the original statute.   Our decisions upon the statute as at first enacted could have no affect to prevent further legislation upon the subject.   So, too, it may well be said that if the Legislature believed that by reason of the relations between the employer and employé, or by reason of the peculiar circumstances liable to surround the latter when called upon to exercise his option, the practical operation of the relief plan might be to relieve the company from its statutory liability without a corresponding adequate benefit to the employé, then an amendment specifically including the relief contract within the prohibition of the statute would not be an unreasonable stretch of legislative power.   Nor is this legislative view of the necessity or propriety of the amendment wholly without foundation.   The average railway employé is not a man of wealth.   More often than otherwise his total possessions, if any, are represented by a modest home, and he depends upon his wages to meet his current living expenses. If he has a family, they, too, are dependent upon his earnings.   If severely injured, the pain from his wounds, the anxiety for his dependent family, the pressure of his immediate needs, are not conducive to calm and businesslike reflection upon what may prove to be a matter of great importance to him and those who look to him for support.   The immediate aid which the Relief Department offers, may, under such circumstances, assume an exaggerated importance in his eyes, and in his weakness and distress lead him to accept a benefit inferior to that which he might otherwise be entitled to recover.   Moreover, the Legislature may well have believed that while membership in the relief department was entirely

voluntary, in the legal sense of the word, it was still possible for the employer, by making the tenure of service more secure to those who became members, to bring to bear an influence in that direction savoring of moral coertion. That the possibility of this pressure upon the laborer is not entirely the creature of imagination finds support in appellee's argument, where all employés who refuse to enter the Relief Department are classified as belonging to the " thoughtless and improvident class " of persons whom railway companies try to avoid, and are the " first to go " whenever the service is to be cut down. Conceding that it is beyond the power of the state to take from the employer the right to discharge his employé, or from the employé the equal right to leave the service of his employer, with or without cause, subject, of course, to any legitimate claim for damages for violation of contract, it is none the less true that the state may still properly provide that no contract into which the employer invites his employé, under the express or implied threat that his refusal will mark him as the first to be discharged from employment, shall be of any avail as a defense to an action for the enforcement of a statutory liability created for his benefit.

(2)    The relations between employer and employé are and always have been recognized as proper subjects of police regulation; but recent years, with the extraordinary changes wrought in industrial affairs, have given that phase of our law peculiar prominence. New social and economic conditions have demanded and received the attention of lawmakers and courts. Employer and employé do not stand in the same relative positions which they occupied before the various lines of industry became concentrated in comparatively few hands, and before workers were marshaled into such vast armies that employers must of necessity deal with them in masses rather than as individuals. These changes have not been accomplished without serious friction between wage payers and wage earners. Where the blame or respon-

sibility rests is not for us to consider. The condition has existed and still exists, and neither Legislature nor courts can with propriety ignore it. In every industry employing any considerable amount of labor the employés are organized for associated effort, seeking to maintain or increase labor's share of the wealth it assists in producing. Employers are likewise organized to check or offset the power and influence of associated labor. Strikes and lockouts are by no means uncommon, and no year goes by when some one or more of these contests does not assume formidable proportions, disturbing the peace and good order of society and inflicting injury of a most serious nature upon all lines of business. The tying up for a single day of a single railroad system is attended by grave inconvenience and loss to the public, while anything like a general suspension of traffic is productive of immediate and widespread calamity. So close and vital is the dependence of the public welfare upon harmony between labor and capital that the Legislature may well exercise a liberal discretion in the enactment of measures to suppress and guard against every influence which tends to promote discontent or discord between them. This truth has already challenged general attention and has found expression in the statutes and court decisions of every state of our Union. Among the legislative measures recognizing the propriety, if not the necessity, of laws for the protection and promotion of the interests of labor, we may mention those providing for the establishment of bureaus of labor, for preference to claims for labor in the settlement of insolvent estates, for laborer's liens, for the employer's liability for personal injuries to employés, for the screening and weighing of coal as a basis of miner's wages, for compulsory payment of wages at frequent or regular intervals, limiting the hours of labor, allowing attorney's fees in actions for the recovery of wages, forbidding the payment of wages in store orders or other paper not redeemable in money, and invalidating the assignment of wages before they are earned. These are but

samples of the many which might be enumerated of laws already in existence in many of the states, and the volume and variety of such legislation is rapidly increasing. Some of these experiments may be crude and of doubtful expediency, and others may be marred by fatal defects; but the general movement of which they mark the progress is proof of the urgency of the demand for an adjustment of the law to meet new and unprecedented conditions. It is true that some of these measures have been invalidated in certain jurisdictions as unconstitutional, while in others they are sustained. Indeed, it is not strange that in dealing with untried conditions Legislatures should have occasionally exceeded their constitutional power, nor is it strange if courts in their conservatism should sometimes have failed to give due consideration to the thought that radical changes in circumstances affecting the public welfare may justify the application of remedies which under former conditions would have been rightfully held arbitrary and unreasonable.

We cannot undertake to collate the conflicting precedents, or determine the mere numerical preponderance of the authorities. After a thorough examination of the cases we are satisfied that the present current of authority tends to uphold all reasonable provisions for the protection of labor, and that Code, section 2071, is fairly within the scope of the powers of the state. We are not impressed with the suggestion, made by some courts which condemn such legislation on the theory that it is an offensive imputation upon the manhood and independence of the laborer to thus assume that he needs the special guardianship and protection of the law. This easy method of argument would wipe out most of our statutes. Generally speaking, all law is made to protect man against undue advantage at the hands of other men, and the chief justification for legislation upon matters of personal and property right is the fact that men do not and cannot always deal on equal footing. Under no circumstances is this inequality more frequent than in the relations between em-

ployer and employé under modern conditions. Indeed, in this inequality of advantage is found the only justification for any of the many labor laws to which we have referred. This condition, as affording sufficient basis for the exercise of police regulation, has often been recognized by the courts.

In *Holden v. Hardy,* 169 U. S. 366, (18 Sup. Ct. 383, 42 L. Ed. 780,) the Supreme Court of the United States in sustaining a statute regulating the hours of labor in mines and making it a penal offense to disregard its terms, says: "The Legislature has recognized the fact, which the experience of legislators in many states has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are to a certain extent conflicting. The former naturally desire to obtain as much labor as possible from their employés, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide and the legislature may properly interpose its authority. . . . But the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere, where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself. The state still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all its parts, and when the individual health, safety, and welfare are sacrificed or neglected the state must suffer."

Sustaining the validity of an act requiring certain corporations to pay off their laborers in money and at specified short intervals, the Supreme Court of Rhode Island uses this language: " If it be said that, however rich and powerful corporations may be and however poor and weak their

employés, the latter are not obliged to work for the former, and if they choose to work for the corporations they can, but for chapter 918, make such agreements as they see fit and thus protect themselves, then it can be replied that poverty and weakness can wage but an unequal contest with corporate wealth and power, and that the Legislature, in granting valuable powers and privileges, might be willing to do it, or if already granted to continue them, if it has retained the power to amend such original grant, only on condition of minimizing the corporate power to drive hard bargains with their employés, who too often, in the sharp and bitter competition for work, have to submit to such terms and conditions as their employers see fit to prescribe." *State v. Brown,* 18 R. I. 16, (25 Atl. 246, 17 L. R. A. 856.)

The state of Tennessee has a statute by which employers of labor who issue store orders or script in payment for labor are required to redeem the same in money if demanded, any agreement or contract to the contrary notwithstanding. This provision was upheld by the Supreme Court of that state in an able and exhaustive opinion as within the proper limits of the police power. Among other reasons stated in support of this view the court says: " The Legislature evidently deemed the laborer at some disadvantage under the existing laws and customs, and by this act undertook to ameliorate his condition in some measure by enabling him, at his election and at a proper time, to demand and receive his unpaid wages in money, rather than in something less valuable. Its tendency, though slight it may be, is to place the employer and employé on equal ground in the matter of wages, and so far as calculated to accomplish that end it deserves commendation." *Harbison v. Iron Co.,* 103 Tenn. 421 (53 S. W. 955, 56 L. R. A. 316, 76 Am. St. Rep. 682). On appeal to the Supreme Court of the United States this judgment was affirmed. The opinion written by Shiras, J., expressly quotes from and readopts the opinion of the Tennessee court as being " so full and satisfactory "

as to make it unnecessary to again go over the ground. *Iron Co. v. Harbison,* 183 U. S. 13 (22 Sup. Ct. 1, 46 L. Ed. 55).

Following the same line of thought, the Supreme Court of Vermont upholds a statute which in effect forbids a railway employé to contract for the assumption of risk of a hazardous appliance or unsafe place to work, saying: "If it be objected that the statute, when thus read, deprives the laborer of his right to make his own contracts, the answer is to be found in the principle that the state has the right to protect its poor and helpless, even to that extent if need be. Such is the basis of the decisions that uphold the Utah labor law restricting the hours of mining work to eight hours per day, statutes that forbid the employment of children in certain callings, the store order acts, and the statutes against usury, in defense of the last-named of which this court held, some 20 years ago, that even a release under seal given by the borrower at the time of the loan did not bar his right to recover the unlawful rate, declaring that the statute was intended for the protection of the weak against the strong, and public policy requires that it should not be evaded nor its force abated. Everybody knows that there are large classes who get their living from day to day in such service as that in which plaintiff was engaged, who must work where they are working and keep their job at all hazards, if they would not bring themselves and their families to want. To say to such, 'If you do not like the conditions, you may quit,' is often only a heartless mockery." *R. R. v. Kilpatrick,* 74 Vt. 288, (52 Atl. 531, 93 Am. St. Rep. 887.)

Mr. Freund, addressing himself to the objection that such statutory restrictions deprive the laborer himself of liberty of contract, says the "argument is fallacious in the case of wage contract where the voluntary assumption by one may, through stress of competition, force others to assume the same burden against their will." Freund on Police Power, section 500-503. See, also, Keating, J., in *Archer v. James,* 2 Best & S. 73; and Byles, J., in same case, page

82. In the very recent case of *Lochner v. New York* (decided by the Supreme Court of the United States) reported in 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, a statute prohibiting owners and proprietors of bakeries from requiring or permitting employés to labor more than 10 hours per day and making a violation of this provision punishable as a public offence, was by a majority decision held to be an unconstitutional interference with liberty of contract. The case is not parallel in fact or principle with the one at bar, but it is worthy of note that four of the nine members of that court unite in a vigorous dissent, holding that even such drastic legislation is clearly within the police power of the state.

In recognizing the soundness of the views expressed by the cited authorities, we do not say, nor is it necessary to believe, that the employer is actuated by a wanton or oppressive spirit. It is enough to say that he is human, and as such is therefore only humanly and naturally inclined to exact a profitable bargain if the opportunity offers, just as the laborer himself is ready to take advantage of favoring circumstances to exact the highest wage. But the opportunities are not equal. The employer, as a rule, has some store of capital to stand between him and immediate want if business grows slack or suspends, while the average laborer has little or no reserve for the proverbial "rainy day," and sooner or later must accept the terms which are offered him. It is with this condition in view that the Legislature has enacted the statute under consideration for the purpose of preserving as near as possible that equality of advantage to both parties which is essential to the general good, and, as is well said in the Harbison case, *supra,* "this alone commends the act as a valid police regulation." To same effect, see *Hancock v. Yaden,* 121 Ind. 366 (23 N. E. 253, 6 L. R. A. 576, 16 Am. St. Rep. 396).

(3) The right of the state to regulate liberty of contract is peculiarly applicable to corporations. That corpora-

tions are entitled to the equal protection of the laws has
11. Regulation    already been shown, but this does not mean
of corpora-
tions.            that corporations and natural persons stand in
the same relation to the power which inheres in the state to
regulate their conduct or methods of business.   The distinc-
tion between them is fundamental and ineradicable.   The
natural person has certain inalienable rights, for which he
is not indebted to organized society.   He is born to them.
The constitution and laws recognize them and provide safe-
guards for them, but do not create them.   The corporate per-
son has no rights except those with which it is endowed by
the lawmaking power, and the power of creation necessarily
implies the power of regulation.   See *Railroad v. Bristol,*
151 U. S. 556 (14 Sup. Ct. 437, 38 L. Ed. 269); *Rail-
road v. Paul,* 173 U. S. 404 (19 Sup. Ct. 419, 43 L.
Ed. 746); *Railroad v. Matthews,* 174 U. S. 96 (19 Sup.
Ct. 609, 43 L. Ed. 909); *Hooper v. California,* 155 U.
S. 648 (15 Sup. Ct. 209, 39 L. Ed. 297); *Insurance Co.
v. Daggs,* 172 U. S. 557 (19 Sup. Ct. 281, 43 L. Ed.
552); *Dayton v. Iron Co.,* 183 U. S. 23 (22 Sup. Ct. 5
46 L. Ed. 61); *Insurance Co. v. Needles,* 113 U. S. 574
(5 Sup. Ct. 681, 28 L. Ed. 1084); *Sinking Fund Cases,* 99
U. S. 700 (25 L. Ed. 496); *Herrick v. Railroad,* 31 Minn.
11 (16 N. W. 413, 47 Am. Rep. 771); *State v. Brown,* 18
R. L. 16 (25 Atl. 246, 17 L. R. A. 856); *Railroad Co. v.
Lyon,* 123 Pa. 140 (16 Atl. 607, 2 L. R. A. 489, 10 Am.
St. Rep. 517); *State v. Peel S. C. Co.,* 36 W. Va. 802, (15
S. E. 1000, 17 L. R. A. 385); *Railroad v. Paul,* 64 Ark.
83 (40 S. W. 705, 37 L. R. A. 504, 62 Am. St. Rep. 154);
*Tullis v. Railroad,* 175 U. S. 353 (20 Sup. Ct. 136, 44 L.
Ed. 192); *Skinner v. Garnett* (C. C.) 96 Fed. 735;; *U. P.
R. R. v. M. C. R. R.,* 128 Fed. 238 (64 C. C. A. 348);
*Commonwealth v. Railroad,* 129 Pa. 324; *Iron Co. v. Harbi-
son,* 183 U. S. 13 (22 Sup. Ct. 1, 46 L. Ed. 55); *S. C.
Street R. R. v. Sioux City,* 78 Iowa, 746.

It is true that in some of the foregoing cases special

prominence is given to an express reservation of power in the state to amend or repeal corporate charters, a rule the applicability of which to the present controversy we need not consider; but the Supreme Court of the United States, which upheld that contention in Railroad v. Paul, *supra*, advances another step in the later case of Iron Co. v. Harbison, *supra,* and announces the rule that irrespective of the right of charter amendment the state is vested with power to enact such legislation. It says: " It is true that stress was laid in the opinion in that case (Paul v. Railroad Co.) on the fact that in the Constitution of the state the power to amend corporate charters was reserved to the state, and it is asserted that no such provision exists in the present case. It is also true that, inasmuch as the right to contract is not absolute in every matter, but may be subjected to the restraints demanded by the safety and welfare of the state and its inhabitants, the police power of the state may, within well-defined limitations, extend over corporations outside and regardless of the power to amend charters." Citing *Atchison v. Matthews,* 174 U. S. 96, (19 Sup. Ct. 609, 43 L. Ed. 909).

The same question was broached in the first case carried to the Supreme Court of the United States to test the validity of a statute abolishing the fellow-servant rule in actions against railway companies. To the objection that the statute was in violation of the fourteenth amendment, Field, J., speaking for the court, replies: " The plain answer to this contention is that the liability imposed by the law of 1874 arises only for injuries subsequently committed. It has no application to past injuries, and it cannot be successfully contended that the state may not prescribe the liabilities under which corporations created by the laws shall conduct their business in the future, where no limitation is placed upon its power in this respect by their charters. Legislation to this effect is found in the statute books of every state." Mackey v. Railroad, *supra; Virginia D. Co. v. Crozer,* 90 Va. 126 (17 S. E. 806, 44 Am. St. Rep. 893).

(4)   Nor does the fact that the corporation is the creature of another state afford it any advantage in this respect. *Hooper v. California,* 155 U. S. 648 (15 Sup. Ct. 207, 39 L. Ed. 297); *Insurance Co. v. Daggs,* 172 U. S. 557 (19 Sup. Ct. 281, 43 L. Ed. 552); *Dayton v. Barton,* 183 U. S. 23 (22 Sup. Ct. 5, 46 L. Ed. 61).   In the Hooper case the Court, sustaining the validity of a statute requiring insurance companies to pay the full sum insured in case of loss, any condition or stipulation of the contract to the contrary notwithstanding, says:   " That which a state may do with a corporation of its own creation, it may do with foreign corporations admitted into the state. . . .   The power of a state to impose conditions upon foreign corporations is certainly as extensive as the power over domestic corporations."   Subject alone to the condition that the regulation imposed does not operate upon interstate commerce or otherwise violate the provisions of the federal Constitution, the power of the state to prescribe the terms on which foreign corporations may do business within it jurisdiction is unlimited.   The fact that the corporation is engaged in interstate commerce does not exempt it from control by the state in respect to all business done therein not directly connected with traffic between the states.   For instance, the local statutes pertaining to the duty to fence railway tracks, imposing liability for live stock killed by moving trains or for damages by fire set out by engines, regulating speed of trains within city or yard limits, abolishing the fellow-servant rule, requiring the redemption of unused tickets, and regulating contracts of employment, are no less applicable to foreign corporations engaged in interstate commerce than to domestic corporations doing only a local business.   *Smith v. Alabama,* 124 U. S. 465 (8 Sup. Ct. 564, 31 L. Ed. 508); *Railroad v. Alabama,* 128 U. S. 96 (9 Sup. Ct. 28, 32 L. Ed. 352); *Willfong v. Railroad,* 116 Iowa, 551; *Railroad v. Murphey,* 116 Ga. 870 (43 S. E. 265, 60 L. R. A.

*12. Regulation of foreign corporations.*

817); *Railroad v. New York,* 165 U. S. 631 (17 Sup. Ct. 418, 41 L. Ed. 853); *State v. Railroad,* 133 Ind. 85, (32 N. E. 817, 18 L. R. A. 502); *Geer v. Connecticut,* 161 U. S. 519 (16 Sup. Ct. 600, 40 L. Ed. 793); *Railroad v. Bolan,* 169 U. S. 133 (18 Sup. Ct. 289, 42 L. Ed. 688).

(5) Considered from the standpoint of precedent alone, we think the weight of the better reasoned cases supports the conclusion at which we have arrived. Such is the manifest force and effect of most of the cases already cited. The following additional precedents, selected from the many found among the decisions of recent date, indicate something of the extent to which the power to regulate and restrict the right of contract, and more especially between employer and employé, has been upheld. In citing them, it is proper to suggest that the decision of the question before us does not require us to adopt all the conclusions reached in these cases or all of the reasoning on which they are based. They are in point, however, as illustrating the trend of judicial thought, and the gradually extending application of the police power in the interest of the general welfare.

In Maryland a statute requiring operators of coal mines to pay the wages of employés in money and at stated intervals, and restricting the right of operators to contract for payment of such wages in merchandise, has been upheld. *Shaffer v. U. M. Co.,* 55 Md. 74. A similar statute in Indiana has been held valid. *Hancock v. Yaden,* 121 Ind. 366 (23 N. E. 253, 16 Am. St. Rep. 396). The same court, in a very recent case, sustains the validity of a statute which prohibits the assignment of claims for wages not yet earned. *International Co. v. Weissinger,* 160 Ind. 349 (65 N. E. 521, 65 L. R. A. 599, 98 Am. St. Rep. 334). A statute of the United States making it unlawful to pay any seaman wages in advance, or to pay such wages to any other person on a seaman's account, and providing that such payment in advance shall not absolve the employer from full payment after the wages have been earned, is held not to invade

any right guarantied by the fourteenth amendment. *Patterson v. The Eudora,* 190 U. S. 169, (23 Sup. Ct. 821, 47 L. Ed. 1002). The court, by Brewer, J., there says: " While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of the government to restrain some individuals from all contracts as well as all individuals from some contracts. It may deny to all the right to contract for the purchase of lottery tickets, to the minor the right to assume any obligations except for the necessaries of existence, to the common carrier the power to make any contract releasing himself from negligence, and, indeed, may restrain all in any employment from any contract in the course of employment which is against public policy. The possession of this power in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property."

Statutes have been sustained which invalidate contracts to waive homestead and exemption laws. *Curtis v. O'Brien,* 20 Iowa, 376; *Kneettle v. Newcomb,* 22 N. Y. 249 (78 Am. Dec. 186); *Maloney v. Newton,* 85 Ind. 365 (44 Am. Rep. 46). A debtor cannot waive stay of execution by contract. *McLane v. Elmer,* 4 Ind. 239. Parties may be required to insert the words " given for a patent " in promissory notes given upon such consideration. *New v. Walker,* 108 Ind. 365 (9 N. E. 386, 58 Am. Rep. 40); *Herdie v. Roessler,* 109 N. Y. 127 (16 N. E. 198). Parties may be prohibited from contracting to pay attorney's fees for the collection of a claim against them. *Churchman v. Martin,* 54 Ind. 380. In Vermont it has been held that a statute which forbids a railway employé to contract to assume the risk of hazardous appliance or unsafe place to work is not unconstitutional. *Kilpatrick v. Railroad Co.,* 74 Vt. 288 (52 Atl. 531, 93 Am. St. Rep. 887). Stafford, J.,

speaking for the court, says: "If the doctrine of assumption of risk is to be regarded as contractual, then we hold that the statutory protection cannot be bought and sold, but the policy of the law forbids it in the interest of public welfare. . . . The Legislature understood this, and the act we are considering was an attempt to better the condition of that very class by compelling the employers to yield something of profit in the interest of humanity and to save the lives and limbs of his workmen by adopting safer instruments of labor. It seems to us that a court should be very slow to construe the beneficial purpose out of such a law or to make it of no effect. On broad lines of public good and social progress it is plain that such legislation must be largely looked to if government is to remain firm and secure in the respect and affection of the people."

Massachusetts having already a statute requiring certain corporations to pay their employés in money in weekly installments, its Legislature submitted to the Supreme Court of that state the question whether such provision could be constitutionally extended to private persons and partnerships. To this inquiry the court responded, and, after citing approvingly many of the cases we have already mentioned and the many statutes regulating and restricting liberty of contract, announced the conclusion that such legislation is not a violation of any constitutional guaranty. *Re House Bill No. 1,230, 163 Mass. 589 (40 N. E. 713, 28 L. R. A. 344).* A provision prohibiting all sales of corporate stocks to be delivered in the future is not a violation of the fourteenth amendment, although its prohibition includes bona fide as well as gambling transactions. *Otis v. Parker, 187 U. S. 606 (23 Sup. Ct. 168, 47 L. Ed. 323).* In support of this holding it is said: "Even if the provision before us should seem to us not to have been justified by the circumstances locally existing in California at the time when it was passed, it is shown by its adoption to have expressed a deep-seated conviction on the part of the people concerned as to the policy

required. Such a deep-seated conviction is entitled to great respect. If the state thinks that an admitted evil cannot be prevented, except by prohibiting a calling or a transaction not in itself objectionable, the court cannot interfere unless in looking into the substance of the matter, it is a clear, unmistakable infringement of rights secured by the fundamental law."

From a general review of the authorities Mr. Freund says (Police Power, sections 502, 503): " The general principle of police regulation of the liberty of contract may perhaps be formulated as follows: When a contractual relation is voluntarily entered into, rights and obligations which are conformable to the nature of the relation may be defined by law and made conclusive upon the parties, irrespective of the stipulations attempting to set them aside, especially where such stipulations involve the waiver of valuable present rights, or where they are virtually imposed by one party without power of choice on part of the other." The case of Peel Splint Coal Co. v. West Virginia, *supra,* affirms the validity of a statute prescribing the manner of weighing coal in determining the amount of a miner's earnings and forbidding payment in scrip or store orders. It is true that this affirmance was by a divided court, but the opinion is so well argued and so well supported by reason and authority that no one desiring to master the learning of the law on this subject should fail to examine it. Moreover, the principle there upheld, having since been fully settled as authoritative by the Supreme Court of the United States in Harbison v. Tennessee, *supra,* the opinion is entitled to rank as authority, notwithstanding the division of the court by which it was pronounced.

As a fitting conclusion to this examination of authorities we quote from the opinion in *Atkin v. Kansas,* 191 U. S. 207 (24 Sup. Ct. 124, 48 L. Ed. 148), sustaining an act making it unlawful for any contractor engaged upon a work of public improvement to require or permit an em-

ployé to work more than eight hours per day: " If it be said that a statute like the one before us is mischievous in its tendencies, the answer is the responsibility therefor rests upon the Legislature and not upon the courts. No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and upon the grounds merely of justice and reason annul statutes that have received the sanction of the people's representatives." As bearing generally upon the extent to which the police power may restrict the liberty of contract, see *Re House Bill* 147, 23 Colo. 504 (48 Pac. 512); *White v. Reservoir Co.,* 22 Colo. 191 (43 Pac. 1028, 31 L. R. A. 828); *Cook v. Howland,* 74 Vt. 393 (52 Atl. 973, 59 L. R. A. 338, 93 Am. St. Rep. 912); *Commonwealth v. Vrooman,* 164 Pa. 306 (30 Atl. 217, 25 L. R. A. 250, 40 Am. St. Rep. 603); *Commonwealth v. Mfg. Co.,* 120 Mass. 385; *Sweeny v. Hunter,* 145 Pa. 363 (22 Atl. 653, 14 L. R. A. 594); *Kriebohm v. Yancey,* 154 Mo. Sup. 67 (55 S. W. 261); *Naglebaugh v. Harder,* 21 Ind. App. 551 (51 N. E. 427); *State v. Crescent Co.,* 83 Minn. 284 (86 N. W. 107, 54 L. R. A. 466, 85 Am. St. Rep. 464); *State v. Moore,* 104 N. C. 714 (10 S. E. 143, 17 Am. St. Rep. 696); *Richardson v. R. R.,* 149 Mo. Sup. 311 (50 S. W. 782); *State v. Wagener,* 77 Minn. 483 (80 N. W. 633, 778, 1134, 46 L. R. A. 442, 77 Am. St. Rep. 681); *Firmston v. Mack,* 49 Pa. 387 (88 Am. Dec. 507); *Eaton v. Kegan,* 114 Mass. 433; *Davis v. State,* 68 Ala. 58 (44 Am. Rep. 128); Act Congress June 26, 1884 (23 Statute 53, chapter 121), construed in case of *The Edwin* (D. C.) 23 Fed. 255. *Higgins v. Graham,* 143 Cal. 131 (76 Pac. 898); *Johnson v. Spartan,* 68 S. C. 339 (47 S. E. 695); *Bowlley v. Kline,* 28 Ind. App. 659 (63 N. E. 724); *Purdy v. Railroad,* 162 N. Y. 49 (56 N. E. 508, 48 L. R. A. 669); *Wheeler v. Russell,* 17 Mass. 258; *Eaton v. Kegan,* 114 Mass. 433; *Karnes v. Insurance*

*Co.,* 144 Mo. Sup. 413 (46 S. W. 166) ; *Brechbill v. Randall,* 102 Ind. 528 (1 N. E. 362, 52 Am. Rep. 695) ; *Butler v. Chambers,* 36 Minn. 71 (30 N. W. 308, 1 Am. St. Rep. 638) ; *Graham v. Lumber Co.,* 26 Ky. Law. 70 (80 S. W. 799) ; *Hotel Co. v. A. B. Co.,* 54 C. C. A. 165 (116 Fed. 793) ; *Munn v. Illinois,* 94 U. S. 113 (24 L. Ed. 77) ; *Railroad Co. v. Wilson,* 4 Willson, Civ. Cas. Ct. App. (Tex.) 568 ; *Booth v. Illinois,* 184 U. S. 425 (22 Sup. Ct. 425, 46 L. Ed. 623) ; *Skinner v. Garnett M. Co.* (C. C.) 96 Fed. 735 ; *Garrett v. W. U. Tel. Co.,* 83 Iowa, 257 ; *Miller v. Railroad* (C. C.) 65 Fed. 305 ; *Squire v. Tellier,* 185 Mass. 18 (69 N. E. 312, 102 Am. St. Rep. 322) ; *Carroll v. Insurance Co.* (U. S.), 26 Sup. Ct. 68 (50 L. Ed. — ) ; *State v. Wilson,* 61 Kan. 32 (58 Pac. 981, 47 L. R. A. 71) ; *Warren v. Sohn,* 112 Ind. 213 (13 N. E. 863) ; *Reilly v. Insurance Co.,* 43 Wis. 449 (28 Am. Rep. 552) ; *Insurance Co. v. Leslie,* 47 Ohio, 409 (24 N. E. 1072) ; *Walp v. Lamkin,* 76 Conn., 515 (57 Atl. 277) ; *State v. Reynolds* (Conn.) (58 Atl. 755.)

Whether the appellee's Relief Department is in the nature of a scheme for insurance, and therefore peculiarly subject to supervision and regulation by the state, has been suggested, but not argued by counsel.    In the Donald and Maine cases we held that said department was not an " insurance company " within the meaning of our laws governing such corporations, and expressly refrained from any further expression of opinion.    That an organization may do an insurance business without being an " insurance company " within the meaning of the statute is settled, as is also the further proposition that it is the nature of the business rather than the form of the organization by which it is carried on, which justifies the state in exercising supervision over it.    *Martin v. Stubbing,* 126 Ill. 387 (18 N. E. 657, 9 Am. St. Rep. 620) ; *Burlington, etc., v. White,* 41 Neb. 662 (59 N. W. 747, 43 Am. St. Rep. 701) ; *Grimes v. Legion of Honor,* 97 Iowa, 315 ; *Sttate v. Miller,* 66 Iowa, 26.    But

whether the Relief Department is of that character we do not now undertake to say.

We are aware that the courts are not in entire unison as to the extent to which the police power of the state may properly be exercised, and that cases are quite numerous which lend color, if not support, to views advanced by the appellee herein. The lack of harmony is in some instances more apparent than real. For instance, the cases from Pennsylvania have been decided under a state Constitution differing very widely from our own. See Const. Pa. 1874, article 3, section 7. With a single exception, none of the cases in which courts have sustained the validity of relief department contracts has involved the question whether such contracts may be regulated or prohibited by statute. They have simply considered the general proposition whether in the absence of statute the contract should be held void on grounds of public policy, and upon that question they coincide with the views of this court in Donald v. Railroad and Maine v. Railroad, *supra*. The exception to which we have referred is *Shaver v. Railroad* (C. C.) 71 Fed. 931, where a trial court held a statute of Ohio to be unconstitutional. The statute there considered differs in material respects from our own, and we may further say that, if the argument employed by the court in support of its conclusion is to be construed as announcing the doctrine in support of which it is here cited by counsel, we think it is not to be approved. Moreover, the Shaver case is in effect overruled, or at least discredited, by *Pierce v. Van Dusen*, 78 Fed. 693 (24 C. C. A. 280, 69 L. R. A. 705). But we freely concede that after eliminating all merely apparent conflict in the cases, not a few others remain which no amount of ingenuity can reconcile, and only confusion could result from the attempt. This court has not before been called upon to consider the central question in the form now presented, and, while recognizing the divergence in the authorities, we feel at liberty to follow the precedents which appear to us most

persuasive and authoritative, and uphold that which appeals
to our judgments as the sounder doctrine.

It is urged upon our attention that the relief fund con-
tract is not unfair in its terms, and that the practical work-
ing of the plan is beneficial to the employés.   All this may
be true, but it is a consideration to be addressed to the
Legislature, and not to the court.   The contract is not as-
sailed because of its oppressive character, but because the
statute forbids its use as a defense in an action to enforce a
statutory liability.   Nor need we dispute the proposition that
a plan of economical insurance against sickness, injury, and
death is much to be commended, and we can readily conceive
that members of the Relief Department may find it a valu-
able resource under many circumstances.   We may also ad-
mit that, in the absence of a statute forbidding it, the
company is not to be censured for making any legal contract
which it is able to negotiate with its employés to protect it-
self from liability for damages.   But none of these are con-
trolling considerations.   The Legislature does not in this act
forbid or place any obstacle in the way of such insurance,
nor does it forbid or prevent any settlement of the matter
of damages with an injured employé fairly made after the
injury is received.   On the contrary, the right to make such
settlement is expressly provided for in the amendment to
Code, § 2071.   The one thing which that amendment was
intended to prevent was the use of this insurance, or relief,
for which the employé has himself paid, in whole or in part,
as a bar to the right which the statute has given him to re-
cover damages from the corporation.   And this, as we have
already said, is clearly within the legislative discretion.
Nor does it work any hardship to the railway company.   The
hardship, if any exists, is in the creation of the liability (the
validity of which legislation is now beyond question), and
not in the statute which prevents its circumvention.

We do not attempt the review of any of the foregoing
questions with special reference to our state Constitution.

The provisions relied upon by counsel are those which announce the right of all persons to acquire, possess, and protect property, and require all laws of a general character to have uniform operation. · Constitution Iowa, article 1, sections 1, 6. The rules there expressed do not differ materially in effect from those embodied in the fourteenth amendment to the federal Constitution. Certainly they place no narrower restriction upon the legislative power. The discussion already had embraces all which need be said upon this branch of the case, and we hold that the objection to the statute as being in contravention of our state Constitution must be overruled.

The dissent from this conclusion, prepared by Ladd, J., and filed herewith, rests in its final analysis upon two propositions: First, that although it would have been within the constitutional powers of the Legislature, in originally enacting Code, section 2071, to have protected the right thereby created by a provision such as is contained in the amendatory act of the Twenty-Seventh General Assembly, yet, the right having been in fact created without it, the subsequent addition of such protection is an unconstitutional discrimination against the railway company; and, second, that the classification by which railway companies alone are made subject to such statutory restrictions is arbitrary and unreasonable, and is therefore unconstitutional and void.

The first of these propositions, that a provision which could have been constitutionally embodied in the original act cannot be constitutionally added by amendment, is one for which we can find neither authority nor precedent, and is in our judgment indefensible in principle. Indeed, it would seem that the very statement of the doctrine is its own sufficient refutation. To adopt such a rule is to say that by the creation of any statutory right or liability the state exhausts its constitutional power to legislate upon the subject, save perhaps to repeal the statute. Most assuredly this cannot be correct. If one General Assembly may create a home-

stead or exemption right and protect it by a provision that no waiver of such right shall be of any validity unless expressed in a given manner and form, or may provide a lien to secure to certain classes of labor the payment of their wages, or may abolish the general rule as to contributory negligence in actions against railway companies for damages by fire, or may abolish the rule as to assumption of risk by railway employés injured because of the company's neglect to equip its cars with automatic couplers and brakes, or may enact any of hundreds of rights and liabilities such as are to be found upon nearly every page of our statute books, may not the next General Assembly amend each and every one of these acts to remedy defects which experience has developed in them, or to increase their efficiency, or to prevent the destruction of a right or the avoidance of a liability so created? For instance, Code, section 2083, provides that an employé who may be injured by the running of a car or engine without automatic brakes and couplers as provided by law shall not be considered as waiving his right to recover damages by continuing in the employ of the corporation. This provision was first enacted by the Twenty-Third General Assembly. Let us suppose that a subsequent General Assembly had amended said section by a further provision that the plaintiff in such case should not be required to negative contributory negligence on his part, would we hesitate for an instant to hold such an amendment was clearly a constitutional exercise of legislative power? In the very nature of governmental and legislative power, the authority to create a statutory liability or right of action implies of necessity the right of amendment. The only conceivable exception to this rule is a case where the original statute is in the nature of a grant or contract, within the rule of the Dartmouth College case. That famous precedent has been made a house of refuge for many theories, but its shelter has never been held broad enough to cover a case like this. The Legislature has seen fit to impose a peculiar liability upon

railway companies in favor of a particular class of employés whose service exposes them to peculiar dangers. That it is not an unconstitutional discrimination has time and again been declared by our courts of last resort. If this be so, by what specious method of reasoning shall we justify ourselves in holding that this constitutional power may not be exercised in amendment, as well as in original legislation? It violates no contract right. It disturbs no vested right. There is no pretense that the contract pleaded in the appellee's answer was entered into before the amendment was enacted. Says the Supreme Court of Wisconsin: "No principle of law is better settled than that whatever is given by statute may be taken away by statute, except vested rights acquired under it, and except, also, that the statute must not be in the nature of a contract on part of the Legislature." *State ex rel. v. Hoeflinger*, 31 Wis. 263.

If the power to abolish or to take away a statutory right is an essential attribute of the legislative authority, is not the power to modify or amend equally broad and equally clear? Under the reserve power of the state to regulate and control corporations and to amend charters, it has often been held that whatever regulation or restriction might lawfully have been included in the original charter may be imposed by subsequent legislation. *Sinking Fund Cases*, 99 U. S. 700 (25 L. Ed. 496) ; *Railroad Co. v. Sioux City*, 78 Iowa, 746; *Railroad Co. v. Williams*, 103 Ky. 378 (45 S. W. 229); *Stanislaus v. San Joaquin*, 192 U. S. 212 (24 Sup. Ct. 241, 48 L. Ed. 406). For still stronger reasons must we hold that, as respects a statute which contains no grant of franchise or other element of contract, and on which no claim of vested rights can be grounded, the power of amendment is no less broad and universal than is the power to create and repeal. When, therefore, the appellee herein employed the appellant, and at the same or subsequent time procured his agreement to the benefit scheme, this law was in existence in its present form, and, by an elementary rule of construction

the contract must be read as if the terms of the statute were embodied in it. While its right to go into the labor market and hire servants upon terms of equal advantage with other railway corporations was a property right of which the company could not be lawfully deprived, it had no legal right to exact terms which the law forbade to all such employers, and, having exacted them, it must be held to have done so with knowledge that the courts would not enforce them for its benefit. It was its privilege, perhaps, to speculate upon the possibility of securing a ruling invalidating the statute, or upon the reluctance of its employés to insist upon their rights under the statute and thereby to a greater or less extent get the benefit of its practical nullification; but it is in no position to complain if, when the test is applied, it is held to the full measure of liability which the law making power has rightfully imposed upon it.

Concerning the second proposition, that the amendment to Code, section 2071, makes an unreasonable discrimination against railway companies as employers, as well as between different classes of employés, it is to be said that this is neither more nor less than a revival of the objection which has been raised against every legislative measure which has ever been enacted for the benefit or relief of any special class of employés, and in practically every instance has been overruled by the courts of last resort. To hold with appellant on this proposition is to attempt to reverse the entire current of the decisions of our own court, of courts of sister states, and of the Supreme Court of the United States. *Kane v. Railroad Co.,* 133 Fed. 681 (67 C. C. A. 653, 68 L. R. A. 790); *Herrick v. Railroad,* 31 Minn. 11 (16 N. W. 413, 47 Am. Rep. 771); *Railroad v. Herrick,* 127 U. S. 210 (8 Sup. Ct. 1176, 32 L. Ed. 109); *Railroad v. Mackey,* 127 U. S. 205 (8 Sup. Ct. 1161, 32 L. Ed. 107); *Railroad v. Montgomery,* 152 Ind. 1 (49 N. E. 582, 69 L. R. A. 875, 71 Am. St. Rep. 301); *Railroad v. Paul,* 173 U. S. 404 (19 Sup. Ct. 419, 43 L. Ed. 746); *Holden v. Hardy,* 169 U. S. 366 (18

Sup. Ct. 383 42 L. Ed. 780); *State v. Brown*, 18 R. I. 16 (25 Atl. 246, 17 L. R. A. 856); *Harbison v. Iron Co.*, 103 Tenn. 421 (53 S. W. 955, 56 L. R. A. 316, 76 Am. St. Rep. 682); *Kilpatrick v. Railroad*, 74 Vt. 288 (52 Atl. 531, 93 Am. St. Rep. 887); *Patterson v. Eudora*, 190 U. S. 169 (23 Sup. Ct. 821, 47 L. Ed. 1002); *Hancock v. Yaden*, 121 Ind. 366 (23 N. E. 253, 6 L. R. A. 576, 16 Am. St. Rep. 396); *Shaffer v. U. M. Co.*, 55 Md. 74; *Tullis v. Railroad Co.*, 175 U. S. 348 (20 Sup. Ct. 136, 44 L. Ed. 192); *Pierce v. Van Dusen*, 78 Fed. 693 (24 C. C. A. 280, 69 L. R. A. 705), and numerous other cases hereinbefore cited. In the Pierce case, *supra*, Mr. Justice Harlan says that, as the statute applies to all railroads operating in the state, it is general in its nature within the meaning of the Constitution, and as it applies alike to all of a given class of employés it operates uniformly, and is therefore not unconstitutional. This language affords a complete answer to the second ground of the dissent herein.

The assertion that the amendment to Code, section 2071, " does not purport to deal with the company's liability at all," and that " the contract contemplated has no bearing on the liability of the railroad company to its employé," is irreconcilable with the clear and express language of the statute. The amended section provides in so many words that under certain circumstances the company shall be liable in damages to its employé, and that in such case no contract of insurance, relief, benefit, or idemnity, nor the acceptance of such insurance, relief, benefit, or indemnity, shall be available to the company as a defense to an action by the employé for the recovery of such damages. How can it be said that this provision, which eliminates a defense which might otherwise be successfully asserted, has " no bearing " on the company's liability? Does not such a provision, which means all the difference between a right of recovery and no right of recovery, " purport to deal with the company's liability "? If, then, as has been settled beyond all controversy, the power

exists in the state to create rights and liabilities for the benefit of employés engaged in the use and operation of railways which are not given to other classes of employés, it is not for this court to say that the Legislature may not properly and constitutionally make special provisions by which those rights may be preserved and those liabilities made effective. It is entirely too late in the day to insist that special legislation affecting the rights and liabilities of railway companies or other distinct class or kind of corporations constitutes a denial of the equal protection of the laws, simply because the same regulation or restriction is not extended over other corporations or other kinds of business. *Railroad Co. v. Mathews,* 165 U. S. 1 (17 Sup. Ct. 243, 41 L. Ed. 611); *Tullis v. Railroad,* 175 U. S. 348 (20 Sup. Ct. 136, 44 L. Ed. 192); *Railroad v. Pontius,* 157 U. S. 209 (15 Sup. Ct. 585, 39 L. Ed. 675); *Railroad v. Paul,* 173 U. S. 404 (19 Sup. Ct. 419, 43 L. Ed. 746); *Ins. Co. v. Daggs,* 172 U. S. 557 (19 Sup. Ct. 281, 43 L. Ed. 552); *Fidelity v. Mettler,* 185 U. S. 308 (22 Sup. Ct. 662, 46 L. Ed. 922); *Duncan v. Missouri,* 152 U. S. 377 (14 Sup. Ct. 570, 38 L. Ed. 485); *Railroad v. Backus,* 154 U. S. 421 (14 Sup. Ct. 1114, 38 L. Ed. 1031); Railroad v. Herrick, *supra;* *Railroad v. Beckwith,* 129 U. S. 26 (9 Sup. Ct. 207, 32 L. Ed. 585); *Railroad v. Duggan,* 109 Ill. 537 (50 Am. Rep. 619); *Railroad v. Dey,* 82 Iowa, 312; *Gano v. Railroad,* 114 Iowa, 719; *Cameron v. Railroad,* 63 Minn. 384 (65 N. W. 652, 31 L. R. A. 553); *Railroad v. Simonson,* 64 Kan. 802 (68 Pac. 653); *Ins. Co. v. Dobney,* 189 U. S. 301 (23 Sup. Ct. 565, 47 L. Ed. 821); *Ins. Co. v. Lewis,* 187 U. S. 335 (23 Sup. Ct. 126, 47 L. Ed. 204); *Campbell v. Railroad,* 121 Mo. 340 (25 S. W. 936, 25 L. R. A. 175, 42 Am. St. Rep. 530); *State v. Nelson,* 52 Ohio St. 88 (39 N. E. 22, 26 L. R. A. 317); *Railroad v. May,* 194 U. S. 267 (24 Sup. Ct. 638, 48 L. Ed. 971); *Railroad v. Snell,* 193 U. S. 30 (24 Sup. Ct. 319, 48 L. Ed. 604.)

The demurrer to the appellee's answer should have been

sustained.    The ruling and judgment of the district court are reversed, and cause remanded for further proceedings not inconsistent with this opinion.— *Reversed.*

Ladd, J. (dissenting).— I cannot yield my assent to the conclusion reached by the majority.    I am of the opinion that the amendment to section 2071 of the Code, enacted by the Twenty-Seventh General Assembly, is in plain and palpable violation of those portions of the federal and state Constitutions prohibiting class legislation, and will in as brief a way as practicable state my reasons for so thinking.    The general rules applicable to the case are correctly stated in the opinion of the majority and need not be repeated.    The difficulty arises in their application.    The section before amendment read:    " Every corporation operating a railway shall be liable for all damages sustained by any person, including employés of such corporation, in consequence of the neglect of the agents, or by any mismanagement of the engineers or other employés thereof, and in consequence of the willful wrongs, whether of commission or omission, of such agents, engineers or other employés, when such wrongs are in any manner connected with the use and operation of any railway on or about which they shall be employed, and no contract which restricts such liability shall be legal or binding." This statute merely does away with the common-law rule that the master is not responsible for the negligence of a fellow servant engaged in the use and operation of a railroad, which results in damage to another employé injured, when his employment exposed him to the hazards of such use and operation.    A cause of action is created in favor of a class of employés whose work exposes them to the perils peculiar to railroading.    The legislation is not in the interest and for the protection of all railroad employés, but for one class of them, a mere fraction of the entire body.    This was noted in *Deppe v. Railroad Company,* 36 Iowa, 52, where, in order to uphold the constitutionality of the law as it then stood, when as-

sailed as class legislation, the court limited the employés to those operating a railway, saying: " The manifest purpose of the statute was to give its benefits to employés engaged in · the hazardous business of operating railroads. When thus limited, it is constitutional; when extended further, it becomes unconstitutional." The soundness of this decision was questioned in *Malone v. Railway Co.*, 61 Iowa, 326, but it was approved in the same case, reported in 65 Iowa, 422, wherein it is said: " To meet the objection that the act of 1862 created a rule of liability which was applicable to railroad companies alone, and did not affect other employés under precisely the same circumstances, and that it was, therefore, class legislation, and in violation of the state Constitution, the court in Deepe's case construed the act as creating a remedy only in favor of that class of employés who were engaged in the hazardous business of operating railroads, and the correctness of the holding of that case on that question is not doubted." See, also, *Conners v. Railway Co.*, 111 Iowa, 387.

The same thought was expressed by the Supreme Court of Minnesota in *Johnson v. Railway Co.*, 43 Minn. 222 (45 N. W. 156, 8 L. R. A. 419), where, speaking through Mr. Justice Mitchell, in referring to a previous case, declaring that a similar statute in that state must be construed as designed exclusively for the benefits of those who would in the course of their employment be exposed to the peculiar hazards incident to the use and operation of railroads, it said: " If the distinction is to be made as to the liability of the employers and employés, it must be based upon a difference in the nature of the employment, and not of the employer. One rule of liability cannot be established for railway companies merely as such, and another rule for other companies under like circumstances and conditions. Neither would it relieve the act from the imputation of class legislation that it applies alike to all railroads. It has been sometimes loosely stated that special legislation is not class, ' if all per-

sons brought under its influence are treated alike under the same conditions.' But this is only half the truth. Not only must it treat alike, under the same conditions, all who are brought ' within its influence,' but in its classification it must bring within its influence all who are under the same conditions. Therefore, if the distinction is to be made between railway corporations and other employers as respects their liability to employés, it must be based upon some difference in the nature of the employment, and can only extend to cases where such difference exists." In passing on a like statute in *Chicago, Kansas & Western Railway Company v. Pontius,* 157 U. S. 209 (15 Sup. Ct. 585, 39 L. Ed. 675), the Supreme Court of the United States based its approval of the decision of the Supreme Court of Kansas in the same case, reported in 52 Kan. 264, 34 Pac. 739, on the same ground, saying: " The hazardous character of the business of operating a railroad seemed to call for special legislation with respect to a railroad corporation having for its object the protection of their employés as well as the safety of the public."

As the fellow servant law applies only to a certain well-defined class of railroad employés and excludes all others, the majority are certainly mistaken in suggesting that the mere fact that the employer must be a railway company is controlling in the matter of classification. The reason for sustaining the original section, as seen, was the hazardous employment of those for whose protection it was enacted. It operated upon all who might be injured while engaged in an occupation of peculiar peril. A right of action is given when, but for the statute, none would have existed. All other employés of the railroad companies are excluded from its operation. The difference in their situation was thought to be such as to warrant separate legislation applicable to one class and not to the other. In creating this new liability the Legislature guarded against its impairment by adding that " no contract which restricts such liability shall be legal or

binding." This law stood on the statute book without any material change for thirty-six years. In the meantime causes of action created thereby were shielded by no protective legislation other than that accorded those arising otherwise or possessed by the class of railroad employés not exposed to the peculiar perils incident to the use and operation of railroads. Was there anything in the nature of this statutory right of action or the class of persons to whom it was made available which so differentiated it from other rights of action or from other classes of employés that separate and distinct legislation might be demanded for the protection of it or the class for whom it was created? Certainly the origin of the right can furnish no sound reason for its separate classification. A cause of action is no more nor less sacred when created by statute than it would be had it existed at common law; and in order that legislation with respect thereto not applicable to other causes of action may be sustained there must be some ground for such discrimination. It is not enough that the amendment might have been permissible in the enactment of the original statute a third of a century ago. The conditions which will justify the separation of subjects into different classes for the purpose of legislation must have relation to the time when it is enacted. Otherwise the constitutional inhibition of class legislation may be defeated by a classification based solely on past events having no connection with the needs of the hour or the demands of the present generation. In *State v. Garbroski,* 111 Iowa, 496, the classification was condemned because it rested " on a past and completed transaction having no relation to the particular legislation enacted. All citizens are divided," said the court, " into two classes — those who served in the army and navy thirty-five years ago, and all those who did not. In present conditions and circumstances, there are no differences between them in their relation to society and the administration of the law and other citizens of the state. . . . Equality in right, privilege, burdens, and protection is the thought running

through the Constitution and laws of the state; and an act intentionally and necessarily creating inequality therein, based on no reason suggested by necessity or difference in conditions or circumstances, is opposed to the spirit of free government and expressly prohibited by the Constitution."

If there is some present difference between causes of action which arise by virtue of the statute enacted thirty-six years before any protection was attempted, and those arising in favor of other employés of a railroad company by virtue of those natural principles of justice which have been recognized for so long a time that the memory of man runneth not to the contrary, or if there is anything in the genesis of either, or if there are such distinctions between the classes of employés entitled thereto respectively, these have not been pointed out, and I assert, without fear of successful contradiction, they cannot be. True, a statute may be amended, and when this has been done it will be read with the amendment, and both construed prospectively as though they had been enacted at the same time. This, however, is merely a rule of construction. Endlich on Statutes, section 297. But this in no way obviates the fact that the amendment may constitute distinct and independent legislation, to be construed in connection with the original only from the time of its adoption. *Ely v. Holton,* 15 N. Y. 595. Its validity must be determined as of the time of its enactment and in the light of circumstances and conditions then existing, or, if not existing, then having relation to the present and to the particular legislation.

Let us examine this amendment, remembering that it is applicable to but the one class of employés. For convenience it may be set out: " Nor shall any contract of insurance, relief, benefit, or indemnity in case of injury or death, entered into prior to the injury, between the person so injured and such corporation, or any other persons or association acting for such corporation, nor shall the acceptance of any such insurance, relief, benefit, or indemnity by the

person injured, his widow, heirs, or legal representatives af-
ter the injury, from such corporation, person or association,
constitute any bar or defense to any cause of action brought
under the provisions of this section; but nothing contained
herein shall be construed to prevent or invalidate any settle-
ment for damages between the parties subsequent to injuries
received." If this can be said to restrict in any way the lia-
bility of the company, it adds nothing to the original statute,
for it declared any such contract invalid. But it purports
to deal, not with the company's liability, but with its en-
forcement. It relates, first, to an independent and different
subject, namely, to contracts of " insurance, relief, benefit or
indemnity," invalidating them as to both parties; and, sec-
ond, to the remedy in declaring that acceptance of the above
shall not operate as a bar or defense to an action for an in-
jury suffered. The contract contemplated does not affect
the liability of the railroad company. Its only relation to
the original act is the fact that both concern the same class
of employés. Nor does the portion with respect to the ac-
ceptance of benefits in any way restrict the liability of the
company. *Donald v. Railway,* 93 Iowa, 284. Its only rela-
tion to the statute as it stood is that it protects the cause of
action thereby created from waiver involved in the election of
remedies. That such election as between any insurance, re-
lief, benefit, or indemnity that may be stipulated, and re-
covery of damages against the railroad company, is essential
to avoid restricting its liability in violation of the original
act, was pointed out in Donald's case. The requirement
of an election between remedies is not restrictive of the right
to either, and the only effect of the second portion of the
amendment is to declare that an election to take insurance,
relief, benefits, or indemnity will not estop the injured party
from availing himself of the other remedy; that is, prose-
cuting his cause of action against the company. In other
words, this amendment has no connection with the original
act, further than that it concerns the same class of employés

and declares that a certain election of remedies shall not constitute an estoppel of the cause of action therein created.

I shall not stop to discuss whether these are so germane to the subject of the section of the Code before being amended as that the title to the amendment was sufficient. It is enough for present purposes that the amendment does not limit in any way, nor add to the duties imposed or liabilities created by that section. It merely accepts the classification of that statute as the basis of legislation upon different subject-matter, namely, contracts with reference to insurance, etc., and the effect of accepting thereunder as constituting an estoppel. Surely these are not so connected with the object and purpose of the original act that the amendment can be upheld because based on the classification there recognized. The subjects covered by the amendment are just as important to railroad employés not exposed to the peculiar hazards of operating trains, and precisely as applicable to their situation and condition. Why invalidate insurance or relief contracts of the former and enforce those of the latter? Why give effect to the acceptance of benefits by the latter as an estoppel against the prosecution of a cause of action against the employer, and not do so when the acceptance is by the former? If there is " some apparent natural reason, some reason suggested by necessity, by such a difference in the situation and circumstances of the subjects placed in different classes as suggests the necessity or propriety of different legislation with respect to them," it has not been mentioned in the opinion of the majority. The fundamental defect in the amendment is that it does not bring " within its influence all who are under the same conditions." The conditions under which the injuries are received can have no bearing on the question as to whether one shall be bound by a waiver of his right to maintain his cause of action by reason of some contract of insurance, relief, benefit, or indemnity, and another shall not. Both stand in the same relation to the company. Notwithstand-

ing, this amendment declares with respect to the employé within the fellow servant act that receiving benefits of such a contract shall not be a bar to the maintenance of an action against the company, while receiving the benefits by a servant within the terms of that act may be a bar to any further recovery. There is no ground for thus discriminating between the employés of the same corporation, and such classification is arbitrary and unreasonable.

The facts of this case will very well illustrate the inequality of the law. The benefits of the defendant's relief department are not restricted to any class of employés. All may become members. Nor are these limited to injuries for which the company might be liable. All manner of injury, as well as sickness, is included. " In case of injury to a member, he may elect to accept the benefits in pursuance of these regulations, or to prosecute such claims as he may have at law against the company or any company associated therewith in the administration of their relief departments." But acceptance of the benefits is made a bar to the maintenance of an action against the company, as is also the maintenance of such action a bar to any claim for relief. That is, a member must elect whether he will take the benefits stipulated by the regulations of the department, or rely on redress in the courts for his injuries. The plaintiff, though he had contributed but 85 cents to the relief fund and had expressly agreed to all the conditions, accepted benefits to the amount of $492 and $330 paid to his physicians, and then in disregard of said conditions instituted this action. As he had been exposed to the peculiar hazards of railroading, taking this money did not bar his right to recover from the defendant, if the amendment to the statute is valid. Had he suffered like injury while engaged in some of the other employments of the company, the amendment would not apply, and under the decision in *Donald v. Railway,* 93 Iowa, 284, election to take the benefits of the Relief Department would have been final, and he could not maintain the action.

Is this equality before the law? The difference in the employments could by no possibility furnish ground for a distinction. What difference can there be, when it comes to the matter of settlement of claims between one of the trainmen and the company, growing out of the alleged negligence of a co-employé in the train service, and the claim of a shopman, growing out of the negligence of the master or vice principal in that department? None whatever, for the manner of the injury has no relation to the subjects touched by the amendment. Nor is there any very satisfactory reason for making such a law applicable to railroad companies, and not to manufacturing and other corporations within the state. It would not seem that there is anything peculiar about railroad companies which should deprive them or their employés of the advantage of contracts of insurance, relief, benefit, or indemnity, in case of injury or death of their employés, when such advantage is accorded to other corporations and their employés in the adjustment of the claims between them.

The only difference which might support separate legislation which suggests itself is the public character of the common carrier and the possible tendency of the Relief Department, by obviating burdens involved, to lessen the vigilence and care of the railroads essential to the safety of the public. If this were so (and it is to be said that in so far as indicated by the record it is purely imaginary), it would furnish no ground for the distinction between employés of the same company. The safety of the public is quite as dependent on the diligence and foresight of the great body of men doing the work of railroads in positions not exposing them to the dangers of moving trains as of those who are thus exposed. The inclusion of railroad companies only in a class to be affected by statute has sometimes been upheld, not because the subjects to be affected are railroad companies, but owing to the character of their business, the peculiar nature of the risks included, or the nature of their property. Thus special laws with reference to the assess-

ment and taxation of property have been sustained, owing to difference in the nature of railroad property. *Taylor v. Secor,* 92 U. S. 575 (23 L. Ed. 663); *Pittsburg, C., C. & St. L. R. R. Co., v. Backus,* 154 U. S. 421 (14 Sup. Ct. 1114, 38 L. Ed. 1031). An examination of the decisions generally will demonstrate that something more tangible than a mere name, business, or purpose of a corporation is exacted by the courts as a basis of classification. There must be some connection between the legislation and the subjects upon which it operates, and within the latter must be included all subjects in like situation and circumstances.

An instructive case is that of *Gulf, Colorado & Santa Fé R. Co. v. Ellis,* 165 U. S. 150 (17 Sup. Ct. 255, 41 L. Ed. 666). The Legislature of Texas had enacted a statute providing that where a claim in certain instances against a railroad company, not exceeding in amount $50, shall be presented to the company, supported by an affidavit, and if the company fail to pay the same within thirty days, a recovery may be had, and an attorney fee of $10 shall be " assessed and awarded by the court or jury trying the issue." This was denounced as class legislation, and the court, speaking through Mr. Justice Brewer, said:

No individuals are thus punished and no other corporations. The act singles out a certain class of debtors and punishes them, when for like delinquencies it punishes no other. They are not treated as other debtors or equally with other debtors. They cannot appeal to the courts as other litigants under like conditions and with like protection. If litigation terminates adversely to them, they are mulcted in the attorney's fees of the successful plaintiff; if it terminates in failure, they recover no attorney's fees. It is no sufficient answer to say that they are punished only when adjudged to be in the wrong. They do not enter the court upon equal terms. * * * Before a distinction can be made between debtors, and one be punished for a failure to pay his debts, while another is permitted to become in like manner delinquent without any punishment, there must be some difference in the obligation to pay, some reason

why the duty of payment is more imperative in the one instance than in the other. If it be said that this penalty is cast only upon corporations, that to them special privileges are granted, and therefore upon them special burdens may be imposed, it is sufficient answer to say that the penalty is not imposed upon all corporations. The burden does not go with the privilege. Only railroads of all corporations are selected to bear this penalty. The rule of equality is ignored. It may be said that certain corporations are chartered for charitable, educational, or religious purposes, and abundant reason for not visiting them with a penalty for the nonpayment of debts is found in the fact that their chartered privileges are not given for a pecuniary benefit. But the penalty is not imposed upon all business corporations or those chartered for the purpose of private gain. The banking corporations, the manufacturing corporations, and others like them are exempt. Further, the penalty is imposed not upon all corporations charged with quasi public duty of transportation, but only upon those charged with a particular form of duty. So the classification is not based upon any idea of special privileges by way of incorporation, nor for special privileges incurred thereby for purposes of private gain, nor even of such privileges granted for the discharge of one general class of public duties. * * * But, if the classification is not based upon the idea of special privileges, can it be sustained upon a basis of business in which the corporations to be punished are engaged? That such corporations may be classified for some purposes is unquestionable. The business in which they are engaged is of a peculiarly dangerous nature, and the Legislature, in the exercise of its police powers, may justly require many things to be done by them in order to secure life and property. Fencing of railroad tracks, use of safety couplers, and a multitude of other things easily suggest themselves. And any classification for the imposition of such special duties, duties arising out of the peculiar business in which they are engaged, is a just classification, and not one within the prohibition of the fourteenth amendment. Thus it is frequently required that they fence their tracks, and as a penalty for a failure to fence double damages in case of loss are inflicted. *Missouri P. R. Co. v. Humes,* 115 U. S. 512 (6 Sup. Ct. 110, 29 L. Ed. 463). But this and all kindred cases proceed upon a theory of a special duty resting upon railroad

corporations by reason of the business in which they are engaged, a duty not resting upon others, a duty which can be enforced by the Legislatture in any proper manner; and whether it enforces it by penalties in the way of fines coming to the state or by double damages to a party injured, is immaterial.    It is all done in the exercise of the police power of the state and in view to enforce just and reasonable police regulations.

This decision is not impinged by what was said in *St. Louis, I. M. & S. R. Co. v. Paul,* 173 U. S. 404 (19 Sup. Ct. 419, 43 L. Ed. 746), where an act of the General Assembly of Arkansas, requiring railroad companies, upon the discharge of employés, to pay the wages due on the day of such discharge, and providing as a penalty for nonpayment that wages shall continue at the same rate until paid, but not longer than sixty days unless action is begun, was upheld as amendment of the railroad charter.    See same case reported in 62 Am. St. Rep. 154, and note.  The Ellis case was again adhered to in *Atchison, T. & S. F. R. Co. v. Matthews,* 174 U. S. 96 (19 Sup. Ct. 609, 43 L. Ed. 909), which construed a statute of Kansas declaring the setting out of fires in the operation of a railroad shall be *prima facie* evidence of negligence, and upon recovery authorizing the assessment of a reasonable attorney's fee.    This was justified on the ground that its purpose was to secure the utmost care on the part of the railroad companies to prevent the escape of fires from their moving trains.    The distinction drawn between it and the Ellis case is rather hazy, and the denunciation of the statute as class legislation by Mr. Justice Harlan, in which three other justices concurred, seems unanswerable; yet the classification, in any event, included all companies or individuals operating trains.    The Ellis case was again approved in *Fidelity Mutual Life Ass'n v. Mettler,* 185 U. S. 308 (22 Sup. Ct. 662, 46 L. Ed. 922), in which a statute of Texas enacting that life and health insurance companies, upon failure to pay losses within the time speci-

fied in their policies after demand made, shall pay the beneficiaries, " in addition to the amount of the loss, 12 per cent. damages on the amount of such loss, together with all · reasonable attorney's fees for the prosecution and collection of such loss." This was put on the ground, first, of the state's power to impose conditions on its own and foreign corporations; and second, on the differences between life and health companies and fire, marine, and inland insurance, and also mutual benefit and relief associations, and " the necessity of prompt payment in order to provide the means of living, of which the beneficiaries have been deprived by the death of the insured," is emphasized.

In my opinion there is no way by which to uphold the amendment to section 2071 of the Code without disregarding the Ellis case and ignoring the necessity of material differences between classes of individuals or corporations to justify the application of different laws thereto. Attention to the question involved in the concrete, rather than the abstract, can lead to no other result. The amendment nullifies agreements of one class of employés of railroad companies and permits those of another to be enforced. A " square deal " would exact that all employés be included and each be accorded the same protection by the law. It singles out for protection the claims of a part of those in the service of railroad companies and excludes from its benefits the claims of the remainder and of all employés in the service of all other corporations in like·situation. The courts are open to the favored class, notwithstanding any contract of insurance, relief, benefit, or indemnity, and acceptance thereunder, but to all others they are closed. In the words of Mr. Justice Brewer, " they do not enter court on equal terms." What I object to is the discrimination by this statute between men when there is no basis for such discrimination. All in like situation should stand equal before the law. No favoritism should be tolerated. If it is a good law for an employé who operates an engine, it is equally good for the dispatcher who

directs the movement of engines and trains.   If its enact-
ment is essential for the protection of the brakemen from
undue pressure from their employer, it is equally essential
to shield the trackmen from the same influence.   There
is nothing in the situation of the one which will justify
extending the protection of a statute like that under con-
sideration for his benefit and denying such protection to the
other.   " The true principle requires something more than
a mere designation by which such characteristics as will
serve to classify, for the characteristics which thus serve
as a basis of classification must be of such a nature as mark
the object so designated as peculiarly requiring exclusive
legislation.   There must be some substantial distinction
having referrence to the subject-matter of the proposed
legislation, between the objects or places embraced in such
legislation and the objects and places excluded.   The marks
of distinction on which the classification is founded must be
such, in the nature of things, as will in some reasonable
degree at least account for or justify the restriction of the
legislation." *State v. Hammer,* 42 N. J. Law, 439.   The four-
teenth amendment to the Constitution of the United States
prohibits the denial to any person within its jurisdiction
the equal protection of the laws.   The sixth section of article
1 of the Constitution of this state exacts that all laws shall
have a uniform operation, and that privileges and immuni-
ties shall not be granted to any citizen or class of citizens
which upon the same terms shall not equally belong to all
citizens.   These provisions of the fundamental law, denounc-
ing discrimination, should not be frittered away.   Their
importance in guarding against the segregation of society
into classes, and in assuring to all citizens that equality before
the law which is essential to free government, cannot be over-
estimated.   The constitutionality of this amendment cannot
be sustained save by resort to refinements in distinction and
sophistry in reasoning in which no court should indulge and
which would be destructive of the above limitations on legis-

lative power. For these reasons I am of the opinion that the district court rightly held the statute invalid. So believing, it is unnecessary for me to consider whether it was also violative of a portion of the Constitution guarantying the freedom of contracts.

Since submitting the foregoing, the majority have added to their opinion a rejoinder, which may be responded to briefly. The assertion that anything which might have been included in the statute as originally enacted may be added by way of amendment is not borne out by the illustrations cited. Thus, in case of an exemption or homestead, it is quite as essential to the protection of the family that these be preserved as that they be granted, and hence protective measures enacted by way of amendment are supported by the same classification as the original act. The vice in the reasoning lies in the assumption that protective measures have been enacted and sustained regardless of any present requirement of conformation to the provisions of the Constitution. In every instance cited, the subsequent statute, if challenged, has been sustained because the class for which enacted was such as to render special legislation appropriate. If the doctrine asserted were to be accepted, all necessary in order to avoid the constitutional prohibition against class legislation would be the enactment of a law by way of an amendment to some former statute of ten years or a century ago, instead of a new and independent act. Lapse of time and changes in conditions cannot be thus obliterated in determining whether a statute is open to the charge of unjust discrimination, and no authority is cited so holding. No one questions the legislative power to abolish, take away, or modify statutory rights. All insisted upon is that in doing so the Legislature is not independent of or superior to the Constitution, but must accomplish this in the way exacted by that instrument. Here is a cause of action created by statute. It has stood, with respect to the remedy, for thirty-six years on precisely the same footing as other causes of action, exist-

ing or created before or since. After the lapse of that time it is amended. The liability created by the original statute must not be confused with the remedy which is sought to be affected by the amendment. The liability arises upon the happening of the injury. The amendment does not purport to change it in any way. It in no way restricts the liability previously created. It adds nothing thereto. It relates solely to the remedy. Had it been enacted as part of the original act, it would have constituted a part of the right, and must have been upheld as valid; for, being part of the right created, the same classification of necessity would sustain it. See *Major v. Railway,* 115 Iowa, 309; *Hawley v. Griffin,* 121 Iowa, 667. But, as seen, this remedy was not added until long after the cause of action was created, and consequently did not become a part of the right. It was a distinct and independent provision for the protection of a particular cause of action, and can no more be upheld than had it related to any other liability created by statute or existing at the common law. Had the subject of its protection been some other liability of a railroad company or individual, no question could arise as to whether it should comply with the constitutional requirements of the uniformity and classification. Can it be that the mere fact alone that a liability has been created by statute will justify a separate and peculiar remedy not available to all persons in like situation? Such is the logical deduction from the opinion of the majority. The Legislature may look back one or one hundred years, and if, perchance, the cause of action had its origin in a statutory enactment, it may be singled out for a special remedy, and this, regardless of its similarity with other causes of action, or the persons to be affected, or the changes wrought by lapse of time. I am not ready to indorse any such theory. I am unwilling to resort to any species of reasoning, having no substantial basis, in order to avoid the clauses of the Constitution denouncing unjust discrimination.

Believing that the amendment to the statute is in conflict

with the requirements of the Constitution, I am of opinion that the judgment of the district court so declaring should be affirmed.

BISHOP, J.— I concur in the result reached by LADD, J., upon the views expressed by him.